AMERICAN CIVIL LIBERTIES UNION OF OHIO FOUNDATION, INC., Plaintiff,

v.

Robert ASHBROOK, et al., Defendants.

No. 1:01CV0556.

United States District Court, N.D. Ohio, Eastern Division.

June 11, 2002.

Raymond V. Vasvari, Jr., American Civil Liberties Union of Ohio, Sara E. DeCaro, ACLU of Ohio Foundation, Cleveland, OH, for Plaintiff.

Daniel P. Whitehead, Mark D. Landes, Isaac, Brant, Ledman & Teetor, Columbus, OH, for Defendants.

## MEMORANDUM & ORDER

O'MALLEY, District Judge.

A poster of the Ten Commandments hangs prominently in a gilded frame in a Court of Common Pleas in Richland County, Ohio. The issue before this Federal Court is whether this display violates the Establishment Clause of the First Amendment to the United States Constitution. The Court holds that it does.

Plaintiff, the American Civil Liberties Union of Ohio Foundation, Inc. ("ACLU"), brings this action on behalf of its members in Richland County, Ohio, against the Honorable James DeWeese ("Judge DeWeese" or "the Judge"), the judge who hung the Ten Commandments on the wall, as well as the Commissioners of Richland County, Ohio—Robert Ashbrook, David Swartz, and Daniel Hardwick ("Commissioners"). All of the Defendants are sued in their official capacities. The ACLU asserts two causes of action: the hanging and continued display of the Ten Commandments allegedly violates (1) the Establishment Clause of the First Amendment to the

United States Constitution, as incorporated against the states by the Fourteenth Amendment, and (2) Article I, § 7 of the Ohio Constitution. The ACLU seeks essentially one remedy: an order directing removal of the poster.

Judge DeWeese and the Commissioners move for summary judgment, and the ACLU moves for partial summary judgment against the Judge. For the reasons stated below, the Court **GRANTS** Plaintiff's motion for partial summary judgment against Judge DeWeese and orders him immediately to remove the poster of the Ten Commandments. The Defendants' motions are **DENIED**.

## I. Findings of Fact

The framed poster of the Ten Commandments at issue in this case hangs in Courtroom Number One in Richland County, Ohio—the courtroom of Judge DeWeese, an elected judge of the General Division of the Court of Common Pleas. DeWeese Deposition, pp. 6, 9–11. The poster is located on the side wall of the courtroom, near the front of the audience section. DeWeese's Motion for Summary Judgment (docket # 17), Exhibit C. Directly opposite and across the gallery from the poster of the Ten Commandments hangs a similarly styled and framed poster of the Bill of Rights. *Id.*

After the Judge created both of these posters on his computer and had them enlarged, he had them framed at a local framing store. DeWeese Depo., p. 11. All of this was done at his own, personal expense; no Richland County funds were used. *Id.* at 30; Affidavit of DeWeese, ¶ 6. While the Commissioners were neither consulted on nor involved in the hanging of these posters, they have not asked the

Judge to remove either one of them.[1] DeWeese Depo., p. 30. The Judge hung both of these posters in the courtroom in July of 2000, without any public announcement. *Id.* at 12; DeWeese Aff., ¶ 8. Any costs the county bears in maintaining these posters is *de minimis.* DeWeese Depo., p. 30.

The style of both posters is identical; at the top, in the largest-sized, bold typeface, are the words "the rule of law." Docket # 17, Exhibits A & B. Below this heading, the two documents are identified in a smaller-sized, all-capital typeface—"THE TEN COMMANDMENTS" and "BILL OF RIGHTS." *Id.* Following this, in the smallest, though still prominent, typeface, are the actual texts of both documents. *Id.* Although the Judge is not sure, he believes that he used an encyclopedia as the source for both documents. DeWeese Depo., p. 12. The version of the Ten Commandments hanging in his courtroom reads as follows:

**the rule of law**

THE TEN COMMANDMENTS

I.

Thou shalt have no other gods before me.

II.

Thou shalt not make unto thee any graven image. Thou shalt not bow down thyself to them, nor serve them for I the LORD thy God am a jealous God.

III.

Thou shalt not take the name of the LORD thy God in vain; for the LORD will not hold him guiltless that taketh his name in vain.

IV.

Remember the sabbath day, to keep it holy. Six days thou shalt labor, and do all thy work. But the seventh day is the sabbath of the LORD thy God: in it thou shalt not do any work.

V.

Honor thy father and thy mother: that thy days may be long upon the land which the LORD thy God giveth thee.

VI.

Thou shalt not kill.

VII.

Thou shalt not commit adultery.

VIII.

Thou shalt not steal.

IX.

Thou shalt not bear false witness against thy neighbor.

X.

Thou shalt not covet thy neighbor's house, thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his ox, nor his ass, nor anything that is thy neighbor's.

Plaintiff's Motion for Summary Judgment (docket # 24), Exhibit B.[2] The are no captions or plaques accompanying the posters that describe or explain their purpose or

---

1. At least one Commissioner has stated publicly, moreover, that he supports the continued display of the Ten Commandments in the courtroom. *See* "ACLU Sues Over Courthouse Ten Commandments Poster," Columbus Dispatch, March 11, 2001 (quoting Commissioner Robert Ashbrook).

2. The Court has endeavored to reproduce the appearance of the text as it actually appears on the poster in question. This reproduction, however, is far from true to scale, as the actual posters are substantial in size.

expressly tie the two posters together. Docket # 17, Exh. C.

Located on the back wall of the courtroom are three posters featuring portraits of and quotations by ·Thomas Jefferson, James Madison, and Alexander Hamilton extolling the virtues of the jury trial system. DeWeese Depo., p. 44. These posters were hung on the courtroom wall in 1993. *Id.* at 45. Above the jury box hangs a portrait of Abraham Lincoln that was already present in the courtroom when the Judge came onto the bench in 1991. *Id.* at 44. On the front wall of the courtroom hangs the seal and motto of the State of Ohio.[3] *Id.* These were placed on the wall in 1991 or 1992. *Id.* at 44–45.

Courtroom Number One is located on the third floor of the Richland County Courthouse. In the center of this floor is a common area, or lobby, that leads to four courtrooms, as well as several elevators, stairwells, offices, and restrooms. *Id.* at 46–47. There are two other displays in this lobby area. *Id.* The first is a self-contained display of twenty-nine photographic reproductions of historical documents arranged by the National Exchange Club and collectively entitled the "Freedom Shrine." *Id.;* Plaintiff's Opposition Brief (docket # 29), Declaration Exhibit A. It contains historical· documents, such as the Mayflower Compact, presidential inaugural speeches, and: the text of the Star Spangled Banner. The twenty-nine documents were "chosen to exemplify the beginnings of our nation and those subsequent turning points of importance which shaped our national character and eminence."[4] Docket # 29, Decl.Exh. A; Ashbrook Motion for Summary Judgment (docket # 26), Exhibit A. This display was donated by the Exchange Club of Mansfield, Ohio and was erected prior to the Judge coming onto the bench, sometime in the 1980s. DeWeese Depo., pp. 47–48; DeWeese Aff., ¶ 7. The second display consists of a poster containing the portraits of nine historical figures and quotations by them regarding the history of the jury system.[5] Docket #· 26, Exh. A.

## II. Motion for Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

Monroe Doctrine (1823), The Emancipation Proclamation (1863), The Gettysburg Address (1863), Lincoln's Second Inaugural Address (1865), Lee's Letter Accepting Washington College Presidency (1865), The Thirteenth Amendment (1865), Theodore Roosevelt's Letter on Cuba (1907), Wilson's First Inaugural Address (1913), The Nineteenth ·Amendment (1920), F.D.R.'s Four Freedoms Speech (1941), Letter Naming Eisenhower Supreme Commander (1943), General McAuliffe's "Christmas Message" (1944), German Instrument of Surrender, World War II (1945), Instrument of Surrender in the Pacific (1945), and President John F. Kennedy's "Ask Not ..." (*i.e.,* Inaugural) Speech (1961). Docket # 29, Decl.Exh. A; Docket # 26, Exh. A.

3. General use of the state motto, "With God, All Things Are Possible," recently was deemed constitutional by the Sixth Circuit in *American Civil Liberties Union of Ohio v. Capitol Square Review and Advisory Board,* 243 F.3d 289 (6th Cir.2001) (en banc), despite its reference to God. Its presence in the courtroom ·is not at issue here.

4. The entire display contains the following twenty-nine documents: the Mayflower Compact (1620), The Declaration of Independence (1776), Benjamin Franklin's Epitaph (1776), Patrick Henry's Instructions to George Rogers Clark (1778), Washington's Letter to Colonel Nicola (1782), The Treaty of Paris (1783), The Northwest Ordinance (1787), The United States Constitution (1787), Washington's First Inaugural Address (1789), The Bill of Rights (1789), Washington's Farewell Address (1796), Jefferson's First Inaugural Address (1801), The Star Spangled Banner (1814), The

5. For purposes of symmetry, the Court would like to list the historical figures referenced. The parties, however, have failed to identify them.

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. 2505.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

### III. Jurisdiction

This Court has jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1343, over the fed-

eral cause of action as it arises under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983. The Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over the claimed violation of Article I, § 7 of the Ohio Constitution.

■ Despite such clear grounds for jurisdiction in this Court, in his motion for summary judgment, Judge DeWeese asks this Court to abstain from deciding the issue presented. More precisely, the Judge argues that this Court should defer, out of principles of comity and federalism, to a sister court's "decorating" choices: "[i]t is inconceivable that the Framers intended, by adopting Article III, to constitute the federal judiciary as the interior decorators for the states' judiciaries." DeWeese's Motion for Summary Judgment (docket # 17), p. 16. The Judge contends, moreover, that any decision by which this Court would "inject itself into the matter of the wall hanging in an Ohio state courtroom" would constitute an undue incursion into the "independent jurisdiction of Ohio's state courts." *Id.*

The presence of such arguments in the Judge's brief is unfortunate and, to say the least, misguided. Likening this case to a dispute over interior decorating trivializes the constitutional principles involved and ignores the role and obligation of Federal Courts. The ACLU has alleged that the Defendants' actions violate one of the fundamental guarantees of the First Amendment. The right asserted is a federal one over which the Court has original and primary jurisdiction. While the ACLU also asserts a claim under a like provision of Ohio's Constitution, the proper resolution of the federal constitutional issue is not conditioned upon the resolution of a question of state statutory or constitutional law. Tellingly, the Judge cites to no case law for his proposition that this Court

should, or even could, if it wanted to, decline to decide this matter.

Federal Courts often act in areas involving the alleged incursion by state courts on the constitutional rights of citizens. *See, e.g., Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (holding, under the Equal Protection Clause, that the state may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (holding that the Sixth Amendment's guarantee of the right to state-appointed counsel applies to state criminal prosecutions through the Fourteenth Amendment); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (holding the Fourth Amendment's exclusionary rule applicable to the states). Cases involving alleged violations of the First Amendment are no exception, even when the end result is to "redecorate" courthouses and other public buildings housing courtrooms. *See, e.g., Books v. City of Elkhart, Indiana,* 235 F.3d 292 (7th Cir. 2000) (holding that a display of the Ten Commandments on a municipal building lawn violated the Establishment Clause), *cert. denied,* 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001); *Suhre v. Haywood County,* 131 F.3d 1083 (4th Cir.1997) (overturning a district court decision that dismissed a challenge to a courtroom display of the Ten Commandments on grounds of standing); *American Civil Liberties Union of Kentucky v. McCreary County, Kentucky,* 145 F.Supp.2d 845 (E.D.Ky.2001) (granting an injunction ordering removal of the Ten Commandments from county courthouses and schools); *Kimbley v. Lawrence County, Indiana,* 119 F.Supp.2d 856 (S.D.Ind.2000) (ordering a Ten Commandments monument removed from a courthouse lawn); *Ameri-*

*can Civil Liberties Union of Kentucky v. Pulaski County, Kentucky,* 96 F.Supp.2d 691 (E.D.Ky.2000) (granting a preliminary injunction against a display of the Ten Commandments in a courtroom).

## IV. Standing

Judge DeWeese also challenges the ACLU's standing to sue.[6] The Judge argues that: (1) as no public monies were used to purchase, hang, or maintain the posters, there can be no taxpayer standing; and (2) as the ACLU fails to identify any specific member that was personally offended on a frequent basis, there can be no organizational standing.

In response, the ACLU has submitted the affidavit of Bernard R. Davis, an attorney who practices law in and around Mansfield in Richland County, as well as the deposition of Christie Chicotel, a representative of the ACLU. ACLU's motion for summary judgment (docket # 24), Exhibits C & D. Davis, a member of the ACLU since 1992, indicates that he has practiced law in the area for twenty-nine years, frequently appears in the Richland County Court of Common Pleas, and occasionally appears in Courtroom Number One. Davis Affidavit, ¶¶ 1–2, 4. Davis further indicates that the Ten Commandments display personally offends him and affects his use of the courtroom, a use that is forced upon him by his duties as a member of the bar. *Id.* ¶ 3. Chicotel testified that forty-nine households in Richland County belong to the ACLU of Ohio, although she could not give an exact number of individuals. Chicotel Depo., p. 9. She further testified that she had no information on whether these members were taxpayers. *Id.*

The ACLU is a not-for-profit membership organization. It may have standing to assert the rights of one of its members, even though there is no injury to itself, as long as one of its members is suffering immediate or threatened injury. *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551–54, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In order to sue on behalf of one of its members, the ACLU must show that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *accord Cleveland Branch, National Association for the Advancement of Colored People v. City of Parma, Ohio,* 263 F.3d 513, 523–24 (6th Cir.2001); *Mixon v. State of Ohio,* 193 F.3d 389, 393 n. 1 (6th Cir.1999).

The ACLU has identified a member, Davis, that it claims would have standing to sue in his own right. In order to have standing as an individual, Davis would have to show that he suffered an actual injury caused by the Defendants' conduct that can be remedied by a court. *Washegesic v. Bloomingdale Public Schools,* 33 F.3d 679, 682 (6th Cir.1994). As is true in many First Amendment cases, this injury can be non-economic; " 'unwelcome' direct contact with the offensive object is enough." *Id.* (quoting *Harvey v. Cobb County, Georgia,* 811 F.Supp. 669, 674 (N.D.Ga.1993), *aff'd,* 15

6. The Commissioners do not challenge Plaintiff's standing to bring this action against them.

F.3d 1097 (11th Cir.1994)). In *Washegesic,* the Sixth Circuit found standing where a high school graduate brought suit to remove a portrait of Jesus Christ from a display in the school hallway. Despite having graduated during the pendency of the litigation, the Court held that his status as a student was not relevant because he continued to visit his girlfriend and attend sporting and social events at the school. *Id.* at 681. Similarly, courts repeatedly have found standing where plaintiffs or their members suffer unwelcome direct contact with the Ten Commandments in public facilities. *See, e.g., Books v. City of Elkhart, Indiana,* 235 F.3d 292, 299–301 (7th Cir.2000) (standing exists where plaintiffs are forced to view a religious object because of a right or duty to go to a municipal building where the Ten Commandments monument is located), *cert. denied,* 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001); *American Civil Liberties Union of Tennessee v. Hamilton County,* 202 F.Supp.2d 757, 761–62 (E.D.Tenn.2002) (standing exists where association members have to go to a courthouse housing Ten Commandments to renew automobile license tags, where clergy goes with parishioners, and where professor takes his students on field trips); *Adland v. Russ,* 107 F.Supp.2d 782, 784 (E.D.Ky.2000) (standing exists where plaintiffs' members frequently travel to State Capitol grounds housing Ten Commandments monument); *American Civil Liberties Union of Kentucky v. Pulaski County, Kentucky,* 96 F.Supp.2d 691, 694 (E.D.Ky.2000) (standing exists where plaintiffs need to enter courthouse housing Ten Commandments exhibit in order to conduct civic business).

In this case, Davis practices law in Richland County and frequently appears in the courthouse in the regular course of his job. Davis has appeared in Courtroom Number One before and, given that there are only two Common Pleas Judges in Richland County, he is likely to appear there again. Further, he has indicated that the poster of the Ten Commandments personally offends him and affects his use of the courtroom. This is sufficient to confer standing upon Davis and, derivatively, upon the ACLU of which he is a member. *See Harvey v. Cobb County, Georgia,* 811 F.Supp. 669, 674–75 (N.D.Ga.1993), *aff'd* 15 F.3d 1097 (11th Cir.1994) (holding that an attorney whose practice required him to make regular appearances in the Cobb County Courthouse had standing to challenge the county's placement of the Ten Commandments on a wall outside the clerk's office). Thus, the Court finds that the ACLU has satisfied the first prong of the *Hunt* test.

The second prong of the *Hunt* test— whether the interest sought to be protected is germane to the ACLU's purpose—is easily satisfied. One of the espoused purposes of the ACLU is to seek to preserve the constitutional separation of church and state. The issues presented in this lawsuit are clearly relevant to this goal. As the above-cited cases make clear, the ACLU frequently attempts to further this goal by challenging, among other things, the presence of this kind of display in public facilities. Thus, the Court finds that the ACLU has satisfied the second prong of the *Hunt* test.

Finally, neither the claims raised nor the relief sought require the participation of individual members of the ACLU. Indeed, the parties ask that the Court resolve this matter on cross motions for summary judgment. The ACLU is only seeking a declaratory judgment that the display of the Ten Commandments violates the Establishment Clause, a permanent injunction enjoining the Defendants from maintaining this display, and attorneys' fees. None of this requires the participation of

any individual ACLU members. Thus, the Court finds the ACLU has satisfied all three prongs of the *Hunt* test and, therefore, has standing to assert these claims.

Given these findings on the issue of associational standing, it is not necessary to address the taxpayer standing issue. The Court, accordingly, declines to do so.

## V. The Hanging of the Ten Commandments in Courtroom Number One Violates the Establishment Clause

The Establishment Clause of the First Amendment to the United States Constitution directs that "Congress shall make no law respecting an establishment of religion." In *Cantwell v. State of Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Supreme Court held that the protections afforded by the Establishment Clause against the federal government apply to state governments by virtue of the incorporation of those protections into the due process guarantees of the Fourteenth Amendment. The Supreme Court, in an oft-quoted statement, summarized the meaning of the Establishment Clause:

> The "establishment of religion" clause of the First Amendment means at least this: Neither the state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*. In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between Church and State."

*Everson v. Board of Educ. of Ewing*, 330 U.S. 1, 15–16, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

■ Although highly criticized by many jurists, including several members of the current Supreme Court and members of the Sixth Circuit, the test that must be applied by this Court for determining whether a governmental practice or policy violates the Establishment Clause remains the one set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).[7] *See American Civil Liberties Union of Ohio v. Capitol Square Review and Advisory Bd.*, 243 F.3d 289, 305–06 (6th Cir.2001) (en banc) (reaffirming use of the *Lemon* test); *Books v. City of Elkhart, Indiana*, 235 F.3d 292, 301 (7th Cir.2000), *cert. denied*, 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001) (same). Under *Lemon*, the Court must consider: (1) whether the governmental practice has a secular purpose, (2) whether

---

**7.** The debate over use of the *Lemon* test is most obvious in the various opinions issued by members of the Supreme Court in *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). For more recent discussions of the current criticisms, see *American Civil Liberties Union of Ohio v. Capitol Square Review and Advisory Board*, 243 F.3d 289, 305–06 (6th Cir.2001) (en banc); *Books v. City of Elkhart, Indiana*, 235 F.3d 292, 301 n. 6 (7th Cir.2000), *cert. denied*, 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001); and *Freethought Society v. Chester County.*, 191 F.Supp.2d 589, 594–95 (E.D.Pa.2002).

the primary effect advances or inhibits religion, and (3) whether the practice fosters an excessive entanglement with religion. *Lemon,* 403 U.S. at 612, 91 S.Ct. 2105; *Books,* 235 F.3d at 301. In recent years, some members of the Supreme Court have collapsed the first two prongs of the *Lemon* test into an "endorsement" test—whether, irrespective of the government's actual purpose, the governmental practice conveys a message of endorsement or disapproval. *Books,* 235 F.3d at 302 (citing *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter,* 492 U.S. 573, 592, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)); *Freedom from Religion Found., Inc. v. City of Marshfield,* 203 F.3d 487, 493 (7th Cir. 2000). The Sixth Circuit, in *Granzeier v. Middleton,* 173 F.3d 568, 573 (6th Cir. 1999), interpreted this endorsement test as a refinement or clarification of the second prong of the *Lemon* test. Absent further direction or clarification from either the Supreme Court or the Sixth Circuit,[8] the Court applies the three-pronged *Lemon* test, as refined by the endorsement test, to the case at hand.

### A. Purpose

■ Under the first prong of the *Lemon* test, the Court must determine whether there was an actual secular purpose in hanging the Ten Commandments in Courtroom Number One. *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). The inquiry is not whether a religious purpose also exists, and the Court is not to balance these purposes if there is. *Lynch v. Donnelly,* 465 U.S. 668, 680–81, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (noting that if governmental practices had to be exclusively secular, "much of the conduct and legislation this Court has approved in the past would have been invalidated"). Rather, the inquiry simply focuses on whether or not *a* secular purpose exists. *Edwards v. Aguillard,* 482 U.S. 578, 613–14, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Scalia, J., dissenting). If no valid secular purpose can be identified, then the presence of the Ten Commandments violates the Establishment Clause. *Wallace,* 472 U.S. at 56, 105 S.Ct. 2479; *Lynch,* 465 U.S. at 680, 104 S.Ct. 1355. While the Court normally defers to the government's articulation of a secular purpose, the Court will only accept such a purpose if it is sincere and not a sham. *Edwards,* 482 U.S. at 586–87, 107 S.Ct. 2573; *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980).

■ As the Supreme Court has noted, "[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faith, and no legislative recitation of a supposed secular purpose can blind us to that fact." *Stone,* 449 U.S. at 41, 101 S.Ct. 192; *see also Books,* 235 F.3d at 302 ("[W]e do not think that it can be said that the Ten

8. As discussed below, Defendants contend that the Sixth Circuit's *en banc* decision in *American Civil Liberties Union of Ohio v. Capitol Square Review and Advisory Board.,* 243 F.3d 289 (6th Cir.2001) (en banc), does provide additional direction, and that it actually counsels *against* adherence to *Lemon.* Defendants contend that, after *Capitol Square,* courts in this Circuit should engage in a textualist analysis of the Establishment Clause— looking only to what the Clause said and the perspective of the Framers when saying it. While the majority in *Capitol Square* did engage in a historical examination of the Establishment Clause, it expressly stated that it did not find it necessary to eschew the *Lemon* test. Indeed, the majority explicitly found that its historical *tour de force* was consistent with an application of the *Lemon* test (or the endorsement test) in the circumstances presented there. *Id.* at 306. Hence, this Court, as a lower federal court, remains bound by *Lemon.* The Court also follows *Capitol Square* to the extent it explains how *Lemon* is to be applied in the circumstances at issue here.

Commandments, standing by themselves, can be stripped of their religious, indeed sacred, significance and characterized as a moral or ethical document.").

The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath day. *Stone,* 449 U.S. at 41–42, 101 S.Ct. 192. Given the religious significance of the text of the Ten Commandments, their display may be considered constitutional where, but only where, a state or governmental body attempts to and does dilute the religious aspect of the display in favor of a secular message or purpose. *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 770–71 (7th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1173, 152 L.Ed.2d 117 (2002).

The Supreme Court itself has indicated that such dilution is possible in a number of circumstances—such as where the Ten Commandments are integrated in the curriculum of public schools, for instance, aiding in the study of history, civilization, ethics, or comparative religion, or are used as part of a decorative element encompassing a secular theme, for instance, in a painting or sculpture identifying great historical lawgivers.[9] *County of Allegheny,* 492 U.S. at 652–53, 109 S.Ct. 3086 (Stevens, J., concurring in part and dissenting in part); *Stone,* 449 U.S. at 42, 101 S.Ct. 192. Given the religious origin and nature of the Ten Commandments, however, courts confronted with their display have carefully scrutinized the government's stated secular purpose to determine if it is, in fact, truly secular.

In *Stone,* the Kentucky legislature passed a law requiring the posting of the Ten Commandments on the wall of each public classroom in the state. 449 U.S. at 39, 101 S.Ct. 192, 66 L.Ed.2d 199. Printed at the bottom of each display was the statement: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41, 101 S.Ct. 192, 66 L.Ed.2d 199. In a succinct opinion, the Supreme Court found this avowedly secular purpose to be a sham, given the manner in which the state sought to use the Ten Commandments, their religious

---

**9.** Defendants place great significance on the fact that allusions to the Ten Commandments appear at various locations on the United States Supreme Court Building. The Court notes, however, that the representations on the Supreme Court building are different in kind from, and appear in a different context than, the complete text of the Ten Commandments that appears in Courtroom Number One.

Representations of the Ten Commandments appear in three locations at the Supreme Court. On the pediment above the east entrance to the building, a figure of Moses, seated between the figures of Confucius and Solon, appears holding two tablets. Additional symbolic figures appear on the pediment as well. On the frieze on the south wall of the courtroom itself, Moses appears holding a single tablet. Also featured in the courtroom friezes are Menes, Hammurabi, Solomon, Lycurgus, Solon, Draco, Confucius, Octavian, Justinian, Muhammad, Charlemagne, King John, Louis IX, Hugo Grotius, Sir William Blackstone, John Marshall, and Napolean. Finally, two tablets bearing only the numbers I–X are carved in the inside bottom of one of the doors separating the courtroom from the central hallway of the building. To the extent the text of the Ten Commandments appears at all in these representations, it appears in only one, is written in Hebrew, and is only partial—most notably, only the text of Commandments VI through IX (the most clearly secular) appears.

origins, and the nature of the first few Commandments. *Id.* at 41–42, 101 S.Ct. 192, 66 L.Ed.2d 199. The Supreme Court ordered removal of the postings.

In *Books,* a local judge, disheartened by the growing number of troubled youths, organized various local groups to create and donate a granite monument of the Ten Commandments to be placed on the lawn in front of the city's municipal building. 235 F.3d at 294–95. A nonsectarian version of the Ten Commandments was created by representatives of the Jewish, Protestant, and Catholic faiths, and, at the dedication ceremony in 1958, leaders of these faiths spoke. *Id.* at 294. The monument itself was six feet high and surrounded by various images—two small tablets containing ancient Hebrew script, an eye within a pyramid, an American Eagle grasping an American flag, two small Stars of David, and the Greek letters, Chi and Rho, representing Christ. *Id.* at 296. After receiving a warning that some residents intended to file suit in 1998, the city passed a resolution indicating that the monument's purpose was to commemorate the historical, cultural, and legal significance of the Ten Commandments. *Id.* at 297. The Seventh Circuit, however, afforded little weight to the city's belatedly avowed secular purpose. *Id.* at 304. Instead, the Court focused on the initial impetus for the monument and the individuals involved in its creation. *Id.* The Court found that the monument was created to provide youths with a moral code and to urge the residents to embrace the specific code taught by the Ten Commandments. *Id.* at 303–04. This, the Court found, was an improper purpose—the promotion of religious ideals. *Id.* at 304. The Court also found that the otherwise non-religious symbolism surrounding the monument enhanced, rather than diffused, the religious impact of the display. *Id.* at 302.

In *American Civil Liberties Union of Kentucky v. McCreary County, Kentucky,* 145 F.Supp.2d 845 (E.D.Ky.2001), three counties posted framed copies of the Ten Commandments in courthouses and public schools. In earlier litigation, the Court found that these solitary displays violated the Establishment Clause. *Id.* at 846. In response, the counties erected larger displays, which included the Magna Carta, the Declaration of Independence, the Bill of Rights, the Star Spangled Banner, the Mayflower Compact, a picture of Lady Justice, the national motto, and the Preamble to the Kentucky Constitution, and provided an explanation of the historical and legal significance of each document. *Id.* at 846–47. The counties also articulated a number of purportedly secular purposes for the displays, including that: (1) they were part of the foundation of American law and government; (2) they provided the moral background for the Declaration of Independence and the foundation of the American legal tradition; and (3) they educated the residents regarding documents that played a significant role in the foundation of the American system of law and government. *Id.* at 848. The Court concluded that the addition of other historical documents and the stated purposes was a pretext for the counties' true purpose—posting the Ten Commandments—and, therefore, continued to run afoul of the Establishment Clause. *Id.* at 849–51. The Court based its conclusion on the history of the displays and on the fact that the desire to proclaim the Ten Commandments the cornerstone of American law, even if true to some extent, was still a religious, rather than secular, purpose. *Id.* at 849.

In *Suhre v. Haywood County, North Carolina,* 55 F.Supp.2d 384 (W.D.N.C. 1999), however, the Court found that a display of the Ten Commandments in a courtroom did not violate the Establish-

ment Clause. In 1932, a new courthouse was built in Haywood County. *Id.* at 385. As part of the decorations directly behind the judge's bench in the main courtroom is a seven foot sculpture of the blind Lady Justice holding the Scales of Justice in one hand and the Sword of Justice in the other. She is flanked on either side by much smaller plaques bearing an abridged text of the Ten Commandments in one inch lettering. *Id.* at 386. At the dedication ceremony, the remarks focused on the symbolism of Lady Justice and her historical roots in Greek and Roman mythology. *Id.* at 386–87. To the extent the Ten Commandments were mentioned at all, the remarks indicated that the sculpture was intended to emphasize "the historical truth that centuries before Moses and the Deca-

logue were ever heard of—that even then men loved and worshiped Justice as an attribute of Divinity. . . ." *Id.* at 386. Based on this history, the Court concluded that the purpose of placing the Ten Commandments in the sculpture was not religious in nature, but was instead "to honor and respect the development of the judicial system." *Id.* at 394. According to the trial court, this satisfied the secular purpose prong of the *Lemon* test.[10]

From these cases, and the other reported decisions involving the Ten Commandments, a general pattern emerges. When a governmental entity *specifically* decides to display the Ten Commandments, whether or not part of a larger display, Courts generally find that action to have a religious rather than a secular purpose.[11]

**10.** The Court in *Suhre* also went on to find that, given the many secular symbols surrounding the tablets bearing the Ten Commandments, it was not likely, when considered in context, that a religious meaning would be derived from the display. 55 F.Supp. at 395.

**11.** *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (posting Ten Commandments alone in classrooms avowedly to show foundation of American legal code not secular); *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766 (7th Cir.2001) (placing monument on state capitol grounds as reminder of nation's core values not secular purpose), *cert. denied,* —— U.S. ——, 122 S.Ct. 1173, 152 L.Ed.2d 117 (2002); *Books v. City of Elkhart, Indiana,* 235 F.3d 292, 302 (2000) (placing monument on courthouse lawn to guide troubled youths not a secular purpose), *cert. denied,* 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001); *American Civil Liberties Union of Tenn. v. Hamilton County,* 202 F.Supp.2d 757 (E.D.Tenn.2002) (concluding, based on text of the Ten Commandments alone, that placing plaques in courthouses not secular); *Freethought Society v. Chester County,* 191 F.Supp.2d 589 (E.D.Pa.2002) (religious ceremony dedicating solitary plaque on courthouse facade, as well as the text itself, evidences religious purpose); *ACLU Nebraska Found. v. City of Plattsmouth, Nebraska,* 186 F.Supp.2d 1024 (D.Neb.2002) (placing monu-

ment in city park to urge citizens to embrace its moral code not secular); *American Civil Liberties Union of Kentucky v. McCreary County, Kentucky,* 145 F.Supp.2d 845 (E.D.Ky.2001) (placing Ten Commandments in courthouses and schools to proclaim its foundational value for American law and government not secular); *Kimbley v. Lawrence County, Indiana,* 119 F.Supp.2d 856 (S.D.Ind. 2000) (placing monument on courthouse grounds to display values common to community not secular); *Adland v. Russ,* 107 F.Supp.2d 782 (E.D.Ky.2000) (placing monument on capitol grounds to remind citizens of Biblical foundations of the law of the commonwealth not secular); *American Civil Liberties Union of Kentucky v. Pulaski County, Kentucky,* 96 F.Supp.2d 691 (E.D.Ky.2000) (placing alone and then with other documents in courthouse to teach residents of American religious history and foundations not secular); *Doe v. Harlan County Sch. Dist.,* 96 F.Supp.2d 667 (E.D.Ky.2000) (placing alone and then with other documents in classrooms to teach residents of American religious history and foundations not secular); *Harvey v. Cobb County, Georgia,* 811 F.Supp. 669 (N.D.Ga.1993) (displaying Ten Commandments near courtrooms as recognition of historical, jurisprudential cornerstone in American law not secular), *aff'd,* 15 F.3d 1097 (11th Cir.1994); *Ring v. Grand Forks Pub. Sch. Dist. Number 1,* 483 F.Supp. 272

When, on the other hand, the Ten Commandments are an incidental or essentially inconspicuous part of a larger secular display or are integrated within a larger secular goal, Courts generally find a secular purpose and, thus, no violation.[12]

In this case, unlike many other Ten Commandment cases, there was no unveiling ceremony or legislative resolution from which the Court can glean the purpose of hanging the Ten Commandments in Courtroom Number One. Neither, however, is there the problem of trying to determine a purpose that may have changed over time or that involved many decisionmakers. Instead, a single judicial officer, without initial public fanfare, decided to place the Ten Commandments on the wall of his courtroom. The Court, therefore, must turn to Judge DeWeese's deposition and to the nature of the display itself to determine the purpose behind it.[13]

The Judge testified that, over time, he noticed that the individuals appearing before him in criminal matters "were full of excuses that didn't seem to have any inter-nal government at all." DeWeese Depo. 15. He saw "the same thing happening around our society ... and it became very clear to [him] that we were in something of a crisis in this country in this battle between moral absolutes and moral relativism." *Id.* He decided that, in his educational role as a judge, he needed to "point out the conflict going on in our country between moral absolutes and moral relativism and how fundamentally important it was to our country." *Id.* He felt it was important to point out that "we don't have a rule of men in which men decide what they can do and what they can't do for themselves, but that we have limits beyond which people are not permitted to go." *Id.* at 16. In the Judge's view, the Constitution represents the ultimate legal authority, the Bill of Rights represents a limit on that authority, and the Ten Commandments represent moral limits that we should set for ourselves. *Id.* at 16–17. The Judge believes that the Ten Commandments are "emblematic of moral absolutes." *Id.* at 22. The Judge asserts that, "when we're talking about moral ab-

(D.N.D.1980) (posting placard in every classroom to instill in students the basic mores of civilization and the principles of common law not secular). *But see, Anderson v. Salt Lake City Corp.*, 475 F.2d 29 (10th Cir.1973) (predating *Stone*, placing monument on courthouse grounds is secular); *State v. Freedom From Religion Found., Inc.*, 898 P.2d 1013 (Colo.1995) (placing monument on state capitol grounds sufficiently secular).

**12.** *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (noting in dicta that carvings of Moses holding Ten Commandments on courtroom wall would not violate Establishment Clause if integrated into larger, secular theme, such as great lawgivers); *Stone v. Graham*, 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (noting that states can use Ten Commandments in school curriculum if appropriately integrated into studies of history, civilization, ethics, comparative religion, or similar studies); *Suhre v. Haywood County, North Carolina*, 55 F.Supp.2d 384 (W.D.N.C.1999) (allowing Ten Commandments to be integrated into display honoring development of justice system).

**13.** In their motion for summary judgment, the Commissioners offer five allegedly secular purposes for the Judge's display of the Ten Commandments and the Bill of Rights. Ashbrook Motion for Summary Judgment (docket # 26), p. 17. The Commissioners' purposes are not relevant here, however. The Judge was the one who decided to hang the Ten Commandments on the wall of his courtroom, not the Commissioners. He neither consulted the Commissioners nor asked their permission to hang the Ten Commandments. It is the Judge's purpose, therefore, that is relevant to the Court's inquiry, not the Commissioners' purported purposes. The Court notes, moreover, that the Commissioners' suggested purposes are not in all instances consistent with those espoused by the Judge.

solutes, when we're talking about morality, it seems to me that what they're emblematic of is the fact that God is the ultimate authority in law as opposed to the view that man is the ultimate authority on law." *Id.* at 25–26. As he explains, "[t]hey are the supreme emblems or moral absolutes. In addition, moral absolutes, [he] believe[s], come from divine law, the idea that God is the ultimate authority in law." *Id.* at 26. The Bill of Rights, on the other hand, "are [in his view] the ultimate limits on what we can do in terms of legislative law." *Id.* at 27.

Thus, according to Judge DeWeese, his purpose in hanging the Ten Commandments and Bill of Rights was not so much to foster a philosophical debate between moral absolutism and moral relativism, but, rather, to let people know that "our legal history in this country was based on the view there were moral absolutes," which flow directly from God as the "ultimate authority in law." *Id.* at 26–28. The Judge believes that he would be hampered in his ability to discuss the "philosophy of law" if he were forced to be silent on the question of the origins of the law, which he believes lie in moral absolutes—of which the Ten Commandments are a "supreme emblem." *Id.* at 26–28.

The Judge was clear, and the ACLU does not dispute, that he does not use or refer to the Ten Commandments in any of the official proceedings before him. *Id.* at 18, 20. Rather, while the display is present during all court proceedings, the Judge only refers to them directly when talking to groups that come to visit his courtroom.[14] *Id.* at 18, 20–22. Thus, the Court finds that Judge DeWeese's purpose in hanging the Ten Commandments on the wall of his courtroom was (1) to instruct individuals that our legal system is based on moral absolutes from divine law handed down by God through the Ten Commandments and (2) to help foster debate between the philosophical positions of moral absolutism (as set forth in the Ten Commandments) and moral relativism in order to address what he perceives to be a moral crisis in this country.

This Court agrees that the Ten Commandments are a "precious gift," *Harvey*, 811 F.Supp. at 671, and finds Judge DeWeese's *purposes* are generally laudable—especially in an era where individuals seem more concerned about the events on their favorite television shows than about the moral and legal compass by which they should be guided. Judge DeWeese's *methods*, however, are constitutionally deficient, because the debate the Judge seeks to foster is inherently religious in character. As the Judge makes clear, the debate involving moral absolutism necessarily involves questions of divine law, and the Ten Commandments inherently are symbolic of the link between the two. Despite characterizing the purpose behind hanging the Ten Commandments on his courtroom wall as secular, the Court cannot help but conclude that Judge DeWeese's purpose is, at heart, religious in nature. The "moral absolutes" the Judge has chosen to display are those embraced by particular religious groups. They include directives that are distinctly religious (*e.g.*, "Thou shalt have no other gods before me" and "Remember

---

14. The Judge notes that, prior to this lawsuit, he only referred to the Ten Commandments once or twice to groups visiting his courtroom. DeWeese Depo., pp. 18–19, 49. Since that time, he has had more frequent requests to speak about their presence. *Id.* at 19, 49. Indeed, it appears that the Judge has gone beyond speaking about the Ten Commandments to groups visiting his courtroom and has begun discussing their display in the media, including appearing on religious-based television programs while dressed in his judicial robes to defend his view on this issue.

the Sabbath day, to keep it holy") and others which, though not patently religious, have no parallel proscription in our current legal structure (*e.g.,* "Honor thy father and thy mother" and "Thou shalt not covet ... anything that is thy neighbor's"). A state actor officially sanctioning a view of moral absolutism in his courtroom *by particularly referring to the Ten Commandments* espouses an innately religious view and, thus, crosses the line created by the Establishment Clause. The Court, therefore, finds that the presence of the Ten Commandments in Courtroom Number One fails the first prong of the *Lemon* test.

## B. Effect

Even if the Court were to conclude that Judge DeWeese's purpose in hanging the Ten Commandments was secular, the Court would still conclude that the primary effect of the poster of the Ten Commandments is to endorse or advance religion. Under the second prong of the *Lemon* test, as refined by the endorsement test, the Court must determine whether a reasonable observer would think that the state is endorsing religion by hanging the Ten Commandments on the wall of one of its courtrooms. *Granzeier v. Middleton,* 173 F.3d 568, 574 (6th Cir.1999). In essence, the Court must assess whether the primary effect of the Ten Commandments on the courtroom wall advances or inhibits religion. *Id.* To make this determination, the Court must look at "the totality of circumstances surrounding the display." *Books v. City of Elkhart, Indiana,* 235 F.3d 292, 304 (2000), *cert. denied,* 532 U.S. 1058, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001).

In *Santa Fe Independent School District v. Doe,* 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), the Supreme Court adopted Justice O'Connor's definition of a reasonable observer, as originally espoused in *Wallace v. Jaffree,* 472 U.S. 38, 76, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring in judgment). *See also American Civil Liberties Union of Ohio v. Capitol Square Review and Advisory Bd.,* 243 F.3d 289, 302–03 (6th Cir.2001) (en banc) (defining the "reasonable observer" as a "judicial construct"). Under Justice O'Connor's definition, the focus is on a reasonable observer, much the same way that tort cases focus on a reasonable person. *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 779–80, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring in part and concurring in judgment). Thus, a reasonable observer is not an actual person, and the Court should not focus on the actual perceptions of individual observers. *Id.* at 779, 115 S.Ct. 2440. This reasonable observer is not limited "to the information gleaned simply from viewing the challenged display." *Id.* at 780, 115 S.Ct. 2440. Instead, a reasonable observer is a hypothetical individual who is "deemed to be aware of the history and context of the community and forum in which the religious display appears." *Id.* This reasonable observer, however, is not omniscient. *Capitol Square,* 243 F.3d at 302. Thus, this hypothetical individual's knowledge of the circumstances falls somewhere between that of a completely informed individual and that of a casual passerby. *Id.* at 303.

In this case, the Ten Commandments are located in a courtroom—a place at the seat of government in Richland County. While the Judge hung these posters at his own expense and without consulting the Commissioners, the entire building is plainly owned by the county and under its control, implicitly placing the county's

stamp of approval on their display.[15] The Judge is, moreover, a state official by law. *Mumford v. Basinski*, 105 F.3d 264, 268–69 (6th Cir.1997). Courts closely scrutinize displays at the seat of government because the presence of government is so pervasive and inescapable and, hence, the threat of perceived endorsement so great. *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 772 (7th Cir.2001), *cert. denied*, —— U.S. ——, 122 S.Ct. 1173, 152 L.Ed.2d 117 (2002); *Books*, 235 F.3d at 302; *American Civil Liberties Union of Kentucky v. McCreary County, Kentucky*, 145 F.Supp.2d 845, 852 (E.D.Ky.2001); *Harvey v. Cobb County, Georgia*, 811 F.Supp. 669, 678 (N.D.Ga.1993), *aff'd*, 15 F.3d 1097 (11th Cir.1994).

The Court concludes that a reasonable observer of the Ten Commandments in Courtroom Number One would: (1) believe that the county and/or the State of Ohio have endorsed their presence; (2) know that the Ten Commandments are a sacred text in the Jewish and Christian faiths; and (3) have some awareness of the general influence of at least a portion of this text in American legal history. Whether this reasonable observer would know the Judge's purpose behind the hanging of the Ten Commandments is a more difficult question. The Judge hung the posters without any public announcement or proclamation of their purpose. No resolution or plaque indicates their purpose, either. The Judge testified that, prior to the lawsuit, he only mentioned the Ten Commandments to individuals or groups in his courtroom on one or two occasions.[16] Thus, the Court concludes that a reasonable observer is unlikely to be aware of the Judge's personal purpose, whether or not one characterizes that purpose, as the Court does here, as a religious one.

The reasonable observer in Courtroom Number One, rather, would see two large posters in gilded frames unlike anything else in the courtroom—one of the Ten Commandments and one of the Bill of Rights. The posters are displayed prominently on walls flanking the gallery or spectator portion of the courtroom, placed just beyond the well of the courtroom. These posters are both entitled "the rule of law" and written in identical script. From their position and style, the reasonable observer likely would conclude that they are co-equal in importance—in this courtroom, the Ten Commandments and the Bill of Rights are equivalent. The Judge and the Commissioners argue that giving both posters the title "the rule of law" conveys the secular and historical nature of the Ten Commandments and dilutes their religious nature. The Court is not convinced. If anything, entitling both "the rule of law" has the opposite effect and, instead, creates the appearance that the Ten Commandments are rules of substantive American law, or at least are elevated to this status by this particular court. *See O'Bannon*, 259 F.3d at 773 ("[A]n observer who views the entire monument may reasonably believe that it impermissibly links religion and law since the Bill of Rights and the 1851 Preamble [to

---

15. In his deposition, the Judge claims that neither the Commissioners nor any other governmental entity have any authority to dictate how he decorates his courtroom. DeWeese Depo., p. 30–32. Whether or not this is actually true has no bearing on the Court's analysis. The Judge is a government official and his actions as an official in the courthouse are governmental actions.

16. Since the lawsuit was filed by the ACLU, the Judge indicates he has spoken more frequently about the Ten Commandments and moral absolutism, but this still amounts to discussions before only a few more small groups. DeWeese Depo., p. 52.

the Indiana Constitution] are near the [Ten Commandments].''); *McCreary County,* 145 F.Supp.2d at 851 (''Given the religious nature of this document, placing it among these patriotic and political documents, with no other religious symbols or moral codes of any kind, imbues it with a national significance constituting endorsement.''). The reasonable observer will be left with the impression that Richland County and the State of Ohio endorse the concepts set forth in the Ten Commandments, including those that are distinctly religious, and, indeed, believe that enforcement of those concepts is one of the functions to be carried out in Courtroom Number One.[17] *See Adland v. Russ,* 107 F.Supp.2d 782, 785–86 (E.D.Ky.2000) (finding that the presentation of a Ten Commandments monument on state capitol grounds would lead a reasonable observer to conclude that the state endorsed Christianity). Indeed, a ''reasonable'' courtroom observer might conclude that the Judge would be less favorably disposed to a lawyer or litigant whose religious views or affiliation do not have Judeo–Christian roots. This is an impermissible endorsement of religion and, indeed, of specific religious views.

The Judge and the Commissioners first attempt to avoid the conclusions the Court reaches here by arguing that the context the Court must consider is more expansive, and must include the Freedom Shrine and the jury system poster located in the lobby outside the courtroom. They argue that, within this broader context, any religious message is sufficiently diluted to survive scrutiny. The Court declines to expand the context so broadly. These displays were erected at vastly different times and the self-contained nature of each, as well as their physical separation, belies any connection. There is nothing in the courtroom itself or on the poster of the Ten Commandments that links the courtroom displays to those in the lobby outside. The fact that the Bill of Rights appears in both places actually suggests, to the contrary, that the two posters in the courtroom are not a continuation of the displays outside. The Court concludes that the reasonable observer would not identify the decorations in the courtroom as being part of a collective theme also encompassing those in the lobby, and that those displays do not operate to dilute either the religious nature of the Ten Commandments or the prominence they are afforded in the courtroom.

The Judge and the Commissioners next argue that the Judge is placed in a no-win situation: if the Ten Commandments are completely isolated, the ACLU will argue that the state is impermissibly favoring a religious viewpoint; if they are surrounded with secular legal documents, the ACLU will argue that the state is impermissibly elevating the Ten Commandments to the status of these documents. This argument misses the point. The Court looks to the *effect* of the Ten Commandments in the particular *overall* context in which they are placed. This involves an inquiry into the type of documents, if any, surrounding the Ten Commandments and the nature of the display itself. If they are placed within a larger secular context, such as a historical display of the development of law or perhaps within a collection of numerous moral codes and are a relatively inconspicuous part of that display, the effect of the inclusion of the Ten Commandments may not be to promote or endorse that particular religious belief and may be permissible

---

**17.** As noted above, the majority of the Ten Commandments have no parallel in our secu-

lar legal structure.

under the Establishment Clause. If, on the other hand, the Ten Commandments are placed within a context that fails to dilute the religious nature of the text and suggests the State endorses this particular religious belief to the exclusion of others, their presence will violate the Establishment Clause.

The Commissioners also argue that the display of the Ten Commandments at issue here was expressly endorsed by the district court in *McCreary County* and that this Court should follow that lead. Specifically, the Commissioners point to the fact that, in *McCreary County*, the Court opined that a reference to the Ten Commandments in a courtroom display that has a "legal-historical function" can be a "constitutionally permissible use of the Ten Commandments within the public arena." *McCreary County*, 145 F.Supp.2d at 852–53. Because, the Commissioners claim, at least one of the Judge's purposes in displaying the Ten Commandments is to explain one of the origins of modern law, the display has a "legal-historical function," which this Court should also find constitutionally permissible. *See County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 652–53, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (Stevens, J., concurring in part and dissenting in part) (discussing how the effect of the Ten Commandments can vary depending on the overall context of their display).

The Commissioners selectively cite *McCreary County*, however, and read its reference to displays with a "legal-historical function" far too broadly. What the Court in *McCreary County actually* said was that a display referencing the Ten Commandments "incorporating both religious and secular figures," which " 'signal[s] a respect not for great proselytizers but for great lawgivers,' such as the frieze on the wall of the United States Supreme Court," has a constitutionally permissible "legal-historical function." 145 F.Supp.2d at 853 (footnotes omitted) (quoting *County of Allegheny*, 492 U.S. at 652–53, 109 S.Ct. 3086 (Stevens, J., concurring in part and dissenting in part)). It did not say that all courtroom displays of the Ten Commandments were permissible. And, it did not even say that all displays of the Ten Commandments that refer to or raise the specter of the legal-historical significance of the Ten Commandments were permissible. Instead, *McCreary County* simply reaffirmed the basic principle that certain displays of the Ten Commandments are, given the overall context in which they appear, not violative of the Establishment Clause.

This is the very principle the Court employs here. The Judge's display is simply not analogous to the one discussed in *McCreary County*. The depiction of the Ten Commandments at issue in this case is both prominent and relatively isolated; it is not "integrated" in any meaningful way into a secular display—it is, instead, juxtaposed with the secular Bill of Rights. Unlike the display in the Supreme Court, moreover, the display in the Richland County Courthouse includes, in English, the full text of the Ten Commandments, with all of its attendant religious phrasing and meaning. And, unlike the display in the Supreme Court, there are no other religious "law givers" whose messages are displayed or referenced in the Richland County Courtroom. Quite simply, the circumstances described in *McCreary County* as "constitutionally permissible" are nothing like those presented to this Court.

Finally, Defendants argue that the Sixth Circuit's recent decision in *American Civil Liberties Union of Ohio v. Capitol Square Review and Advisory Board*, 243 F.3d 289 (6th Cir.2001) (en banc), mandates a find-

ing in their favor. While unquestionably this Court follows controlling Sixth Circuit precedent, the Court does not find that *Capitol Square* even counsels, much less necessitates, a finding for the Defendants in this particular case. This Court has applied the same tests and used the same standards employed by the Sixth Circuit in *Capitol Square.*

In *Capitol Square,* the Sixth Circuit found that Ohio's motto, "With God, All Things Are Possible," does not violate the Establishment Clause. The Sixth Circuit found that the purpose behind the state's motto—"boosting morale, instilling confidence and optimism, and exhorting the listener or reader not to give up and to continue to strive"—was secular in nature. *Id.* at 307. The Sixth Circuit also found that the particular reference to God in Ohio's motto represents a type of "ceremonial deism," similar to nondenominational prayers by a legislative chaplain or the national motto, that is not an affront to the Establishment Clause. *Id.* at 299–300. In reaching this conclusion, the Sixth Circuit expressly found that no reasonable observer would find the endorsement of Christianity, or any particular religion for that matter, in the text of the state motto: "There is, after all nothing uniquely Christian about the thought that all things are possible with God." *Id.* at 303. The Sixth Circuit, in fact, relied heavily upon the conclusion that the motto was not of a particularly religious nature at all. These same conclusions cannot be drawn here. The Supreme Court itself has described the text of the Ten Commandments as inherently and distinctly religious, as has virtually every other court to address the question. No court in this or any other Circuit has ever characterized the text of the Ten Commandments as "ceremonial deism." Indeed, several district courts in this Circuit have deemed displays of the Ten Commandments unconstitutional after

*Capitol Square,* apparently not feeling compelled by *Capitol Square* to render a contrary decision. *See, e.g., American Civil Liberties Union of Tennessee v. Hamilton County,* 202 F.Supp.2d 757 (E.D.Tenn.2002); *American Civil Liberties Union of Kentucky v. McCreary County, Kentucky,* 145 F.Supp.2d 845, 852 (E.D.Ky.2001).

The Court concludes, therefore, that a reasonable observer of the Ten Commandments in Courtroom Number One would think that Judge DeWeese, Richland County, and the State of Ohio are endorsing religion. Thus, the presence of the Ten Commandments also fails the second prong of the *Lemon* test.

### C. Entanglement

As none of the parties addressed the third prong of the *Lemon* test—whether hanging the Ten Commandments fosters an excessive entanglement with religion— and the case does not turn on this prong, the Court declines to address it.

### VI. Consideration of Judge DeWeese's Free Speech Rights Does Not Merit a Different Outcome

Judge DeWeese also argues that the hanging of the Ten Commandments was an expressive activity entitled to the protections afforded by the Free Speech Clause to the First Amendment. He contends, therefore, that the Court cannot simply analyze this action under the Establishment Clause, but must also consider the interplay between these First Amendment principles.

■ As the Supreme Court has recognized, however, "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and

Free Exercise Clauses protect.". *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 302, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (quoting *Board of Ed. of Westside Community Schs. (Dist.66) v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (opinion of O'Connor, J.)). As the Judge himself states, the walls of his courtroom are not open for anyone to display whatever message he or she wishes. In fact, he asserts that he is the only individual that can choose what to hang on these walls, even to the exclusion of the Commissioners. DeWeese Depo., p. 30–32. The walls of his courtroom, far from being a public forum, are, instead, a forum only open to the Judge (or possibly other government officials) as a result of the governmental position he holds. Where, as here, a poster endorsing religion has been placed on government property by a government official in a forum only available to the government, the speech is that of the government, and not that of a private individual. *Santa Fe,* 530 U.S. at 302, 120 S.Ct. 2266 (finding that a school policy of allowing student—led prayer before football games was government speech because "[t]hese invocations are authorized by a government policy and take place on government property at government-sponsored school-related events").

The Judge asserts that judges are not "First Amendment orphans" and cites two cases: one involving fundraising and campaign spending in judicial elections, *Suster v. Marshall,* 149 F.3d 523 (6th Cir.1998), and another involving a sheriff's out-of-court statements questioning a grand jury investigation, *Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). While both cases recognized that elected officials retain their free speech rights, neither case involved the interplay between the Free Speech Clause and the Establishment Clause, nor the distinction between government speech and private

speech. Both cases, moreover, deal with speech occurring *outside* the confines of the government offices at issue. Despite the Judge's attempts to characterize the hanging of the Ten Commandments on the wall of his courtroom as private speech, the Court finds otherwise; the cases he cites simply do not call for a different outcome.

## VII. Article I, § 7 of the Ohio Constitution Leads to the Same Result

■ In its second cause of action, the ACLU asserts that Judge DeWeese's actions also violate the Establishment Clause of the Ohio Constitution—Article I, § 7. While the parties did not brief this claim, the Court assumes this silence is because the result on the issues briefed controls the outcome of this claim as well. The Ohio Supreme Court, in *Simmons–Harris v. Goff,* 86 Ohio St.3d 1, 711 N.E.2d 203, 211–12 (1999), considered the Establishment Clauses of the Ohio and United States Constitutions. Although recognizing that they are not co-extensive and the language is, to some degree, distinct, the Ohio Supreme Court adopted the *Lemon* test for determining whether a challenged governmental action violates Ohio's Establishment Clause. *Id.* at 211 ("Today we . . . adopt[ ] the elements of the three-part *Lemon* test. We do this not because it is the federal constitutional standard, but rather because the elements of the *Lemon* test are a logical and reasonable method by which to determine whether a statutory scheme establishes religion.").

As the Court has already found Judge DeWeese's hanging of the Ten Commandments in Courtroom Number One violates the federal Establishment Clause under the *Lemon* test, the Court finds, for the same reasons, that it also violates Ohio's Establishment Clause.

## VIII. Conclusion

The Court feels compelled to address the Defendants' contention that the Plaintiff's position, and hence this Court's ruling, require that the Court ignore the religious beliefs of this nation's founders and the reality that there are moral underpinnings to the development of all law, including what we now define as the country's secular body of law. Judge DeWeese is certainly correct that "the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him." *Abington School District v. Schempp*, 374 U.S. 203, 213, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). John Adams went so far as to write to Thomas Jefferson that "the Bible is the best book in the world. It contains more of my little philosophy than all the libraries I have seen; and such parts of it as I cannot reconcile to my little philosophy, I postpone for future investigation." *Edwards v. Aguillard*, 482 U.S. 578, 606 n. 5, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (Powell, J., concurring) (quoting Letter of Dec. 25, 1813, 10 Works of John Adams 85 (1856)). It was precisely their religious devotion, however, that led the Founding Fathers to incorporate into the Bill of Rights "[b]oth the guarantees of free exercise and against the establishment of religion." *Id.* at 606, 107 S.Ct. 2573. James Madison and others "reacted strongly when they perceived ... religious intolerance emerging in [their new] country," fearing that any "form of forced support of state-established churches" would work to proscribe them from following freely their own religious philosophies and practices. *Id.* at 605, 107 S.Ct. 2573. The Founding Fathers' creation of a "wall of separation between church and State" was designed to ensure "full religious freedom—to believe or not to believe, to participate or not to participate, as one pleases." *Harvey*, 811 F.Supp. at 670. It is beyond argument that the Ten Commandments "are essentially religious texts in the Jewish and Christian traditions." *Id.* at 671, 811 F.Supp. 669. Thus, it is beyond argument that the Founding Fathers meant, with the First Amendment, to reject promulgation of the Ten Commandments by the State, including by the State's judiciary.

In answer to the Defendants' suggestion that a ruling by this Court in favor of the Plaintiff will work to advance the decay of morality in America, the Court quotes the *Harvey* court:

the Ten Commandments are not in peril. They may be displayed in every church, synagogue, temple, mosque, home, and storefront. They may be displayed on lawns and in corporate board rooms. Where this precious gift cannot, and should not, be displayed as a religious text is on government property. For any erosion of the Bill of Rights—restraints voluntarily imposed by the majority to protect the rights of the minority—will inevitably produce prejudice and persecution.

*Id.* Far from being "a narrow-minded view of the First Amendment" (DeWeese's Memorandum in Opposition (docket # 25), p. 2), the Court's ruling is the only view truly *consistent* with the First Amendment and the intent of the Framers of our Constitution. It is, moreover, the only view that provides the broad protections of religious freedoms that the Framers sought.

For the reasons stated above, the Court finds that the presence of the poster of the Ten Commandments in Courtroom Number One fails both the purpose and effect prongs of the *Lemon* test and, therefore, violates both the Establishment Clause of the First Amendment to the United States Constitution and Article I, § 7 of the Ohio Constitution. Plaintiff's motion for partial summary judgment, therefore, is **GRANT-**

ED (docket # 23). Accordingly, Defendants' motions for summary judgment must be **DENIED** (docket # 17 & 26).

The Court hereby **ORDERS** Judge DeWeese immediately to remove the poster of the Ten Commandments from his courtroom.

As the ACLU has failed to move for summary judgment against the Commissioners and the uncontradicted evidence in the record indicates that the Commissioners had no part in the hanging of the Ten Commandments, the Court **ORDERS** the ACLU to show cause within ten (10) calendar days from the date of this Order why the case against the Commissioners should not be dismissed.[18]

The Court recognizes Plaintiff has requested attorney fees in its prayer for relief. The award of attorney fees is generally available for the prevailing party in a § 1983 action. 42 U.S.C. § 1988. The Court will address the extent and scope of such an award in a post-judgment order. Plaintiff has thirty (30) days from the date of this order to file a fully-supported motion for attorney fees.

**IT IS SO ORDERED.**

---

18. The Court notes that, as mentioned previously, Judge DeWeese, as a Common Pleas Judge, is a state actor for purposes of § 1983 liability, not an actor of the local governmental entity. *Mumford v. Basinski*, 105 F.3d 264, 268–69 (6th Cir.1997).