Sue MERCIER, Elizabeth J. Ash, Angela Belcaster, Janet Bohn, Julie Chamberlain, Maureen Freedland, David Goode, Betty Hammond, Curt Leitz, Constance R. Long, David W. Long, Myrna D. Peacock, Becky Post, James L. Reynolds, Ellen Dodge Severson, Eric Severson, Leslie Slauenwhit, Herman S. Wiersgalla, Howard Wiersgalla, James E. Wiffler, Robert Wingate, Henyry Zumach and Freedom from Religion, Foundation Inc., Plaintiffs,

v.

CITY OF LA CROSSE, Defendant.

No. 02–C–376–C.

United States District Court,
W.D. Wisconsin.

July 14, 2003.

**962**

James A. Friedman, La Follette, Godfrey & Kahn, S.C., Madison, WI, for Plaintiffs.

Patrick J. Houlihan, La Crosse City Attorney, La Crosse, WI, for City of Lacrosse.

Michael Dean, Michael D. Dean, LLC, Waukesha, WI, for Fraternal Order of Eagles, La Crosse Aerie 1254.

Francis J. Manion, American Center for Law & Justice, New Hope, KY, for Fraternal Order of Eagles, La Crosse Aerie 1254.

## OPINION AND ORDER

CRABB, District Judge.

This case involves a dispute between defendant City of La Crosse and a number of La Crosse residents regarding the presence of a monument bearing the Ten Commandments in a city park. Similar disputes have become increasingly common in recent years. In just the last few weeks, two federal appellate courts have considered whether the presence of the Ten Commandments on public property violates the establishment clause. *See Glassroth v. Moore,* 335 F.3d 1282 (11th Cir. 2003); *Freethought Society of Greater Philadelphia v. Chester County,* 334 F.3d 247 (3d Cir.2003). In *Glassroth,* the court found a constitutional violation; in *Freethought Society,* the court did not. The widespread nature of these disputes evinces the strength of feeling that religious symbols may generate, both to inspire and to inflame.

The dispute in this case has existed at least since 1985 when plaintiff Freedom from Religion Foundation, two of its members and a resident of La Crosse filed a lawsuit in this court asserting that the city

violated the establishment clause of the First Amendment by displaying the monument in a city-owned park. In an opinion and order dated June 22, 1987, I dismissed the case because the plaintiffs had not shown that they had standing to challenge the display. *Freedom from Religion Foundation, Inc. v. Patrick Zielke,* 663 F.Supp. 606 (W.D.Wis.1987), *aff'd,* 845 F.2d 1463 (7th Cir.1988). Plaintiffs filed a new lawsuit under 42 U.S.C. § 1983 on July 1, 2002, seeking declaratory, injunctive and monetary relief, after defendant continued to refuse the foundation's requests for the monument to be removed. After the lawsuit was filed, defendant sold the monument and a small portion of the park on which it sits to the Fraternal Order of the Eagles, which had originally donated the monument to the city in the 1960s. In addition, both the Eagles and defendant installed fences around the monument and posted signs stating that the property was owned by the Eagles and that defendant did not endorse the religious expression of the monument.

Both sides have filed motions for summary judgment. Plaintiffs argue that the presence of the monument, both before and after its sale to the Eagles, is a violation of the establishment cause. Defendant disagrees, arguing that whatever constitutional infirmities existed with respect to the monument initially have been cured because the monument is now owned by the Eagles and the city has disclaimed any endorsement of religious expression. I agree with plaintiffs. The law of this circuit compels a conclusion that defendant violated the establishment clause when it displayed a monument of the Ten Commandments on public property without a secular purpose for doing so. Furthermore, defendant's sale of a minuscule portion of the park to the Eagles in order to preserve the presence of the monument proves rather than extinguishes defendant's endorsement of the monument's religious message. Thus, I conclude that the sale itself was a violation of the establishment clause. Defendant's motion for summary judgment will be denied and plaintiffs' motion will be granted. The parcel sold to the Eagles must be returned to defendant and defendant must remove the monument from the park. Because plaintiffs' complaint seeks money damages and the parties' motions do not address this issue, the case will proceed to trial on the sole issue of damages.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

## UNDISPUTED FACTS

During the 1950s and 1960s, the Fraternal Order of the Eagles had a practice of donating monuments bearing the Ten Commandments to municipalities throughout the country. The purpose of these donations was to preserve the moral and religious heritage of the United States. In 1964, the Eagles requested permission from defendant City of La Crosse to erect and donate to the city a monument bearing the Ten Commandments, to be placed in Cameron Park, a public park that is owned and maintained by defendant and located in its downtown. Defendant granted the Eagles' request. The city's director of parks and recreation determined the location of the monument within the park. The monument was installed the following year in Cameron Park, where it still stands today. The monument is 5½ feet tall and 2½ feet wide. It stands eight feet from the sidewalk and is plainly visible to anyone standing there. The face of the monument bears the following inscription:

the Ten Commandments

I AM the LORD thy God

Thou shalt have no other gods before me

Thou shalt not make for thyself
any graven images

Thou shalt not take the Name of
the Lord thy God in vain

Remember the Sabbath
day to keep it holy

Honor thy father and thy mother
that thy days may be long

Upon the land which the Lord
thy God giveth thee

Thou shalt not kill

Thou shalt not commit adultery

Thou shalt not steal

Thou shalt not bear false witness
against thy neighbor

Thou shalt not covet thy neighbor's
wife nor his

Manservant, nor his maidservant,
nor his cattle, nor

anything that is thy neighbor's

In addition to these words, the monument depicts two Stars of David and the Greek letters Chi and Ro superimposed upon each other, a symbol that represents Jesus Christ. At the bottom of the monument is the text, "PRESENTED TO THE CITY OF LA CROSSE BY LA CROSSE AERIE AND AUXILIARY NO. 1254 OF THE FRATERNAL ORDER OF THE EAGLES" followed by the date "JUNE 1965."

At the dedication ceremony in June 1965, a member of the Eagles stated that the monument was "dedicated especially to those young people who helped during this spring's flood."

At the time it was built, no other monuments were located in the park. No monuments have been erected in the park since. The local chapter of the Eagles is located across the street from the monument. At night, a spotlight on top of the Eagles building illuminates the monument. The Eagles have assumed responsibility for maintaining the monument since it was erected. Several businesses are located around the park, including a bank, a restaurant and a food coop. In addition, during the growing season, the park is the site of a weekly farmers' market.

In June 2001, plaintiff Freedom from Religion Foundation asked defendant to remove the monument from the park, but the city declined the request. Instead, the Common Council of the City of La Crosse passed the following resolution:

WHEREAS, the Freedom from Religion Foundation has again threatened to sue the City of La Crosse if it does not remove the Ten Commandments Monument from Cameron Park, and

WHEREAS, the monument was given to the City to honor the youth in 1965 who helped fight the flood, and

WHEREAS, the presence of the marker in this context does not necessarily constitute a violation of church and state separation, and

WHEREAS, this gift located in Cameron Park across from the Eagle's Club deserves to remain in its present location by any and all means available to the City.

NOW, THEREFORE, BE IT RESOLVED by the Common Council of the City of La Crosse that the City Attorney be instructed to investigate all necessary resources, monetary and legal, and services, donated or voluntary, from any individuals, and/or organizations, including free legal services from organizations such as the Freedom Council, the American Center for Law & Justice, The Alliance Defense Fund, The Gibbs

Law Firm, PA, or anyone else who may express a willingness to become involved and report back to the Judiciary and Administrative Committee within (30) days.

In a letter to the city attorney dated September 19, 2001, the secretary of the Eagles wrote that "we believe in the ideas etched in this piece of stone" and he offered to accept the return of the monument and place it at another location. Defendant's mayor, John Medinger, met with members of the Eagles and suggested that the city could sell them the "monument site" at fair market value.

In March 2002, a minister from a local Episcopal church offered to display the monument on church property, writing that this would both "hono[r] the law of the land, and preserv[e] the free expression of religious belief."

In June 2002, the city attorney considered defendant's options at a public meeting with defendant's Board of Park Commissioners. He recommended that defendant sell the monument and a surrounding portion of the property in the park to the Eagles because the Court of Appeals for the Seventh Circuit was "in favor" of such an approach. He also said that defendant "needed to focus on the context of why the monument was placed in the park, not the context of the religious monument." The board president commented that the area is "God's Country" and he didn't "like the fact that people from other areas are coming here to tell us what to do." The board approved the sale by a vote of five to three.

In a letter to the mayor dated June 24, 2002, plaintiff Freedom from Religion Foundation offered to purchase the property surrounding the monument for fair market value. Plaintiffs filed this action on July 1, 2002.

In a July 2002 resolution, the Common Council authorized selling the Eagles a 20 foot by 20 foot plot of land "immediately adjacent to and under the Ten Commandment[s] Monument" for fair market value. The resolution states that the portion of the park was "no longer required for park purposes." The plot is bound by King Street on its northern side but otherwise the plot sits in the middle of the park and has no natural boundaries. The city's assessor determined that fair market value was $6.00 for each square foot although other nearby land had been sold for significantly more. As a condition of the sale, the Eagles were required to install "appropriate" fencing and signage "in order to commemorate the youth of the La Crosse area for their assistance and great help for the spring, 1965 flood that the City of La Crosse experienced."

On October 24, 2002, the Eagles installed a four foot tall iron fence around the perimeter of the parcel. On March 18, 2003, the Eagles installed signs on each corner of the fence that read:

This is the property

of La Crosse Eagles

Aerie 1254

Dedicated to the volunteers who

helped save the city of Lacrosse

during the 1965 flood.

Each sign is approximately fourteen inches wide and twenty inches tall.

In April 2003, defendant erected a second four-foot wrought iron fence around the monument. The second fence is gated and is located on city property. Hanging on the north side of the fence facing the sidewalk is a sign with the following text:

**PRIVATE PARK**

THIS PROPERTY IS NOT OWNED OR MAINTAINED BY THE

CITY OF LA CROSSE,

NOR DOES THE CITY ENDORSE THE RELIGIOUS

EXPRESSIONS THEREON

The words "private park" are 10 inches high; the remaining text is four inches high. The sign and its text are visible from the sidewalk. An identical sign hangs on the south side of the fence.

Plaintiff Sue Mercier is a resident of La Crosse, Wisconsin and a member of plaintiff Freedom from Religion Foundation. When visiting her lawyer's office, which is near the monument site, plaintiff Mercier must sometimes alter her route to avoid seeing the monument. She shops at the People's Food Coop and the farmers' market less often than she would if the monument were not in Cameron Park. When she has viewed the monument, it has "disturbed" her emotionally.

Plaintiff Elizabeth Ash is a resident of La Crosse. She does not attend meetings or events held in Cameron Park because she does not want to view the monument. She does not use banks near the monument. When driving downtown, she avoids streets that would take her past the monument. She has stopped going to Cameron Park to sit in it and read books. When she does see the monument, she feels marginalized and has experienced physical pain.

Plaintiff Angela Belcaster is a resident of La Crosse. She patronizes several businesses surrounding Cameron Park, including the People's Food Coop and U.S. Bank. She has changed her route when visiting these establishments so that she does not park in front of the monument. She no longer has lunch in the park because of the monument. However, Belcaster still passes Cameron Park when driving through the downtown. When she approaches the park, she begins thinking about the monument, which distracts her and causes her emotional distress. The monument's presence and defendant's support of it makes Belcaster feel like an outsider.

Plaintiff Janet Bohn is a resident of La Crosse. She sees the monument when she visits the food coop. She becomes so upset when she sees it that she is sick to her stomach. Defendant's decision to leave the monument in the park makes her feel like a "second class citizen" because her beliefs are in the minority. Bohn no longer eats in the park and does not visit the farmers' market because of the monument.

Plaintiff Julie Chamberlain is a resident of La Crosse. She was "appalled" when she first saw the monument in the park. As an art teacher, Chamberlain would like to attend the farmers' market because it includes art. She does not attend, however, because the monument angers her. Chamberlain has seen the monument when displaying her students' art at a business across the street. When viewing the monument, she feels anger and distress.

Plaintiff Maureen Freedland lives in La Crosse. She patronizes several businesses and performs volunteer legal work in offices near the monument. She has altered her travel routes to these destinations to avoid passing by the monument. Although her colleagues eat lunch at the food coop, she does not because she does not want to walk by the monument. She avoids other restaurants in the area as well. She chose not to attend a peace rally that was held in Cameron Park because of the monument. Freedland once attended the farmers' market and viewed the monument. It offended, frustrated and disturbed her. She never went back to the farmers' market. She has been criticized because of her opposition to the monument and experiences sleeplessness. Because her parents are survivors of the Holocaust, Freedland believes very strongly in the separation of church and state.

Plaintiff David N. Goode lives in La Crosse. Goode stopped walking and jogging through the park because of the mon-

ument. He stopped using the Wells Fargo bank that is near the park and opened an account at a different location. He does not attend the farmers' market. Although he still shops at the food coop, he does not buy sandwiches there to eat at the park, even though he would like to.

Plaintiff Betty Hammond lives in Stoddard, Wisconsin. She has worked in La Crosse since the 1970s. She sees the monument when she shops at the food coop and uses the nearby branch of Wells Fargo bank, causing her "a lot of stress and disturbance." The monument's presence has caused her to lose sleep. Hammond has stopped attending the farmers' market because the presence of the monument upsets her too much. She no longer walks through Cameron Park or eats lunch there.

Plaintiff Curt Leitz lives in La Crosse. Leitz learned of the monument right after he moved to La Crosse in 1999 and saw it when walking through the park. He was shocked to see a religious monument in a public park and later became frustrated and angry. He no longer uses the park or walks by it. He would like to take his children to the farmers' market more often but does not because of the monument.

Plaintiff Constance Long lives in West Salem, Wisconsin, which is east of La Crosse. She first saw the monument 25 years ago while walking through the park. She was surprised to see a religious monument on public property. She is an artist and would like to sell her work at the farmers' market in Cameron Park, but she does not because of the presence of the monument. Being in Cameron Park makes her feel "queasy" and less proud to be an American because she believes the city is endorsing a particular religion.

Plaintiff David Long is married to plaintiff Constance Long. He was also shocked that the monument was on public property. He has avoided the street that runs in front of the monument and generally will not go to the park for lunch. He wrote an editorial in the newspaper opposing the monument's presence in the park.

Plaintiff Myrna Peacock lives in La Crosse and has for most of her life. Many years ago, she began altering her route to work so that she did not have to walk near the monument. She began speaking out against the monument in the 1980s and was called a "pinky" and a "commie." Although she shops at the food coop, she would do so more often if the monument was not in the park. She will not buy sandwiches from the coop to eat in the park. Being near the monument makes her uncomfortable and distresses her.

Plaintiff Becky Post lives in Shelby, Wisconsin, which is adjacent to La Crosse. Post will not go to the farmers' market because the presence of the monument disturbs her. The monument makes her feel as if she is "not really a part of this city" and that she "really doesn't belong."

Plaintiff James Reynolds lives in La Crosse. Reynolds tries to avoid Cameron Park because he believes that the monument is an endorsement of religion by the city and it bothers him. However, he shops at several stores around the park, attends the farmers' market and goes to meetings in the park. He does not shop at the food coop as much as he would if the monument was not in the park. He would like to buy sandwiches at the coop and eat them at the park, but he does not because of the monument.

Plaintiff Ellen Dodge Severson lives in La Crosse. When Severson first saw the monument she became uncomfortable because she believed it communicated a message that only Jews and Christians were welcome in the city. Although she attended the farmers' market once or twice, she no longer does so because she was "deeply

bothered" by the presence of the monument.

Plaintiff Eric Severson is married to Ellen Dodge Severson. He was disappointed and frustrated when he first saw the monument. He would like to eat lunch in the park and attend events such as the farmers' market that take place in Cameron Park but he does not because of the monument.

Plaintiff Leslie Slauenwhite lives in La Crosse. Slauenwhite does not need to go downtown often. However, she would like to use Cameron Park for picnics with her family but does not because of the presence of the monument.

Plaintiff Herman Wiersgalla lives in La Crosse. He restricts his shopping at the food coop because the placement of the monument bothers him.

Plaintiff Howard Wiersgalla is the brother of Herman Wiersgalla and lives with him in La Crosse. He was surprised and disappointed when he first saw the monument. He no longer uses the park because the monument is there. He will not attend the farmers' market.

Plaintiff James Wiffler lives in La Crosse and is a member of the Freedom from Religion Foundation. He does not take his children to the park because of the presence of the monument and he will not walk through the park himself.

Plaintiff Robert Wingate lives in La Crosse. Although he is Catholic, the presence of the monument has "shocked and appalled" him. Since 1985, Wingate has avoided Cameron Park. When biking in downtown La Crosse, he alters his route so that he will not pass by the monument.

Plaintiff Henry Zumach lives in Stoddard, Wisconsin and is a member of the Freedom from Religion Foundation. Zumach has stopped using Cameron Park because of the monument. He does not attend the farmers' market and chose not to attend a peace rally at the park. In a period of one year, he "lost sleep" 50 or 60 times thinking about the monument.

Plaintiff Freedom from Religion Foundation is a national organization having the purpose of protecting the principle of church and state separation.

## OPINION

### A. *Standing*

■ As I noted above, I dismissed a case similar to this one in *Freedom from Religion Foundation, Inc. v. Patrick Zielke,* 663 F.Supp. 606 (W.D.Wis.1987), because the plaintiffs had not demonstrated that they suffered an injury beyond being offended, which is insufficient to create a "case or controversy" under Article III of the Constitution. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *American Civil Liberties Union of Illinois v. City of St. Charles,* 794 F.2d 265 (7th Cir.1986); *see also Harris v. City of Zion, Lake County, Illinois,* 927 F.2d 1401, 1405 (7th Cir.1991)("That the plaintiffs may be offended by the defendants' conduct is not enough to confer standing."). Before addressing the merits of this case, I must determine whether plaintiffs have now satisfied the requirements of Article III.

Currently, the Supreme Court applies the "injury in fact" test to standing inquiries. *See, e.g., Gratz v. Bollinger,* —— U.S. ——, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003). Under this test, plaintiffs must demonstrate a "concrete" harm that is "actual or imminent" and "fairly traceable" to defendant's conduct. *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 771, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). In addition, plaintiffs must show that the harm is likely to

subside if they receive the relief they request. *Id.*

Defendant argues that many of the plaintiffs do not have standing because they do not pay taxes to the city. However, paying taxes is not the only, or even the preferred, method of demonstrating standing to challenge the government's actions. *See Valley Forge,* 454 U.S. at 479–80, 102 S.Ct. 752. Rather, in applying the injury in fact test in the context of challenging the display of a religious object, the court of appeals has stated that a plaintiff demonstrates an injury in fact if "he has undertaken a special burden or has altered his behavior to avoid the offensive object." *Books v. City of Elkhart, Indiana,* 235 F.3d 292, 299 (7th Cir.2000). Examples that would satisfy the test include avoidance of the park in which an object is displayed and using alternate travel routes to avoid viewing the object. *Id.* (citing cases); *see also Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (affidavits of plaintiffs stating that they do not use river because they fear contamination caused by defendant was sufficient to demonstrate standing to challenge defendant's conduct under Clean Water Act).

Unlike the plaintiffs in the 1985 case, all of the individual plaintiffs in this case have either altered their behavior to avoid the monument or experienced emotional distress by using the park despite the monument's presence. Although not all of the plaintiffs avoid the monument completely, this is not required to satisfy the requirements of Article III. The injury does not need to be severe, only concrete. *See United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (rejecting government's request to limit standing to those that have been "significantly" affected by defendant's actions). Further, even if plaintiffs had not

altered their behavior, being forced to view a monument that distresses them every time they visited Cameron Park is an injury in itself. Although plaintiffs could choose not to attend the park, a standing analysis inquires only whether a plaintiff has been injured, not whether a plaintiff could avoid the injury. Disagreement with the monument is not a "distinct and palpable" injury, but plaintiffs' alleged diminished enjoyment of the park and experience of emotional distress as a result of the monument are sufficiently concrete to confer standing. *See Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (plaintiffs had standing when they alleged that "aesthetic and recreational" value of park would be lessened because of defendant's conduct); *Leibovitz v. New York City Transit Authority,* 252 F.3d 179, 184–85 (2d Cir.2001) (emotional injury sufficient to confer standing); *cf. Santa Fe Independent School District v. Doe,* 530 U.S. 290, 313–14, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (noting the "serious constitutional injury that occurs" when one is forced to observe religious worship because he or she attends government sponsored event).

■ With respect to plaintiff Freedom From Religion Foundation, "an association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth,* 528 U.S. at 181, 120 S.Ct. 693; *see also Sierra Club,* 405 U.S. at 739, 92 S.Ct. 1361 ("It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review."). At least some of the foundation's members have standing; three of

them are plaintiffs in this action who have altered their behavior to avoid the monument. The foundation's purpose is directly related to the interests at stake: to uphold the separation of church and state. Finally, there is no evidence to suggest that the position of the foundation is in conflict with its members, especially since several of them are already plaintiffs. However, the foundation's standing to sue is limited to injunctive relief because it alleges no injury to itself, only to its members. *See Warth v. Seldin,* 422 U.S. 490, 515–16, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

## B. *Establishment Clause*

The First Amendment to the United States Constitution prohibits Congress from enacting laws "respecting an establishment of religion." Although it is now well settled that the clause applies to any government action and not just laws of Congress, *see Glassroth,* 335 F.3d 1282, 1293–94 (citing cases), the Supreme Court has struggled to give meaning to the establishment clause in a way that accurately reflects its purpose and that does not clash with the protections of the free exercise clause of the First Amendment. In *Everson v. Board of Education,* 330 U.S. 1, 16, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Supreme Court adopted the view of Thomas Jefferson in concluding that the clause "was intended to erect 'a wall of separation' between church and State." In *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Court adopted a more specific test in determining whether the government has violated the establishment clause, asking whether the government had acted with a sectarian purpose, whether the primary effect of the conduct is to advance or inhibit religion and whether the conduct fosters "an excessive government entanglement with religion."

Since *Lemon* was decided, some members of the Court have expressed dissatisfaction with the test, and have advanced alternatives or modifications. In *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), Justice O'Connor in a concurring opinion wrote that in her view, the establishment clause "prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community." Her test focuses on whether there is a "government endorsement or disapproval of religion" that "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Id.* at 688, 104 S.Ct. 1355 (O'Connor, J., concurring). In *County of Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), five justices applied this test to conclude that the display of a creche in the main staircase of a county courthouse violated the establishment clause. The Court held that "government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs." *Id.* at 590–91, 109 S.Ct. 3086. In a dissenting opinion, Justice Kennedy wrote that the test should be whether the government has "coerced" an individual into supporting or participating in a religion. Under this view, "coercion" includes "[s]ymbolic recognition or accommodation of religious faith" that would "place the government's weight behind an obvious effort to proselytize on behalf of a particular religion." *Allegheny,* 492 U.S. at 661, 109 S.Ct. 3086 (Kennedy, J., dissenting); *see also Lee v. Weisman,* 505 U.S. 577, 112

S.Ct. 2649, 120 L.Ed.2d 467 (1992) (applying "coercion" test); *American Jewish Congress v. City of Chicago,* 827 F.2d 120, 129 (7th Cir.1987) (Easterbrook, J., dissenting) ("Symbyology is a different matter; the government often may persuade when it may not coerce"). Although several justices have urged reconsideration of the *Lemon* test, *see, e.g., Tangipahoa Parish Board of Education v. Freiler,* 530 U.S. 1251, 120 S.Ct. 2706, 147 L.Ed.2d 974 (2000) (Scalia, J., dissenting from denial of certiorari with Chief Justice Rehnquist and Justice Thomas), thus far, the Court has declined to overrule *Lemon. Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 395 n. 7, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993).

The court of appeals continues to view the *Lemon* test as controlling, but it considers Justice O'Connor's "perception of endorsement" test as the correct way to analyze whether government conduct has the primary effect of advancing or inhibiting religion, which is the second part of *Lemon. See Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766 (7th Cir. 2001); *Freedom from Religion Foundation, Inc. v. City of Marshfield,* 203 F.3d 487, 493 (7th Cir.2000). In addition, in recent cases, the court of appeals has all but ignored the "excessive entanglement" portion of the *Lemon* test, *e.g. Books,* 235 F.3d 292; *City of Marshfield,* 203 F.3d 487, which is consistent with the Supreme Court's current emphasis on the purpose and effect of a particular government policy, *e.g., Santa Fe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295. In applying the endorsement test, a court must ask whether a "reasonable observer" would view the government's conduct as endorsing religion. *Allegheny,* 492 U.S. at 620, 109 S.Ct. 3086.

### 1. *Mootness*

■ An initial question is what time frame is relevant in determining whether the placement of the monument violates the establishment clause. When plaintiffs filed this action on July 1, 2002, defendant still owned both the monument and the land on which it stood. Since that time defendant has sold the monument and a small parcel of land surrounding it to the Eagles, who have erected fencing around the monument and placed signs on the fence in an attempt to comply with the law. Just before the summary judgment deadline, defendant erected a second gated fence around the monument on city property and displayed additional disclaiming signs. Thus, there is a question whether plaintiffs' claims are moot to the extent they are challenging past events.

■ With respect to plaintiffs' claim for damages, the answer is clearly no. "[A] defendant's change in conduct cannot render a case moot so long as the plaintiff makes a claim for damages." *Federation of Advertising Industry Representatives, Inc. v. City of Chicago,* 326 F.3d 924, 929 (7th Cir.2003). With respect to plaintiffs' request for injunctive and declaratory relief, the question is whether it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources,* 532 U.S. 598, 609, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (internal quotations omitted). *See also Global Relief Foundation, Inc. v. O'Neill,* 315 F.3d 748, 751 (7th Cir.2002) (case was not moot "while any possibility remained" that defendant would revert to past conduct).

The court of appeals has occasionally stated that this standard may be relaxed when the government is the defendant because its acts of self-correction are more trustworthy than private parties. *See, e.g., Federation of Advertising Industry Representatives,* 326 F.3d at 929–30. This

rule has not been adopted by the Supreme Court, which affirmed the use of the "absolutely clear" test in *Buckhannon,* a case involving public defendants. Even in this circuit, the practice of granting public defendants greater deference has been applied unevenly at best. *Compare Federation of Advertising Industry Representatives,* 326 F.3d at 929–30, *and Magnuson v. City of Hickory Hills,* 933 F.2d 562, 565 (7th Cir.1991) (applying deference), *with Pleasureland Museum, Inc. v. Beutter,* 288 F.3d 988, 999 (7th Cir. 2002) (applying "absolutely clear" standard in case involving government defendant and concluding case was not moot when defendant stated that it would "suspend enforcement" of challenged policy), *and Milwaukee Police Association v. Jones,* 192 F.3d 742, 747 (7th Cir.1999) (stating that government defendant must show that there is no "reasonable expectation that the wrong will be repeated"), *and Sefick v. Gardner,* 164 F.3d 370, 372 (7th Cir.1998) (stating that voluntary cessation of challenged conduct did not eliminate controversy in case against government officials because new policy was "not implemented by statute or regulation and could be changed again").

In any event, it is defendant's burden to show that the challenged behavior will not recur. *Friends of the Earth,* 528 U.S. at 189, 120 S.Ct. 693. Defendant has made no argument to demonstrate the monument will stay as it is now. The monument remained in the hands of defendant for more than 35 years, even after it was sued in 1985. Defendant made no efforts to address plaintiffs' complaints regarding the monument until it was threatened with a second suit in 2001. It has enacted no new law or policy regarding the monument. It has not conceded that the monument's placement in the park before the sale violated the establishment clause but rather stated in the June 2001 resolution that "the presence of the marker in this context does not necessarily constitute a violation of church and state separation." Accordingly, I cannot conclude that the controversy is moot with respect to the location of the monument before the sale.

### 2. *Constitutionality before the sale*

■ Courts have rejected the view that the presence of a religious symbol on public property invariably violates the establishment clause. Rather, the Supreme Court has emphasized that it will not focus exclusively on the religious nature of a symbol but that it will examine the context in which the symbol is placed. *Allegheny,* 492 U.S. at 595–97, 109 S.Ct. 3086; *Lynch,* 465 U.S. at 679, 104 S.Ct. 1355; *see also Glassroth,* 335 F.3d 1282, 1300–01 ("[F]actual specifics and context are nearly everything when it comes to applying the Establishment Clause to religious displays and symbols."); *American Jewish Congress,* 827 F.2d at 129 (Easterbrook, J., dissenting) (suggesting that establishment clause test requires "scrutiny more commonly associated with interior decorators than with the judiciary"). Thus, although the Court has recognized that the Ten Commandments are "undeniably a sacred text in the Jewish and Christian faiths," *Stone v. Graham,* 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (per curiam), it has also rejected the view "that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization." *Edwards v. Aguillard,* 482 U.S. 578, 594, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).

It was the context of the Ten Commandments display that made the difference in the decisions by the Court of Appeals for the Eleventh Circuit in *Glassroth* and the Court of Appeals for the Third Circuit in *Freethought Society.* In *Glassroth,* Chief Justice Moore of the Alabama Supreme

Court had installed a large monument of the Ten Commandments in the rotunda of the Alabama State Judicial Building. The Chief Justice testified that the purpose of the monument "was to acknowledge the law and sovereignty of the God of the Holy Scriptures." Noting the large size of the monument, its prominent placement in the courthouse and the inclusion of the actual text of the Ten Commandments on the monument, the court concluded that the monument had no secular purpose and that it conveyed a message of religious approval to a reasonable observer. In *Freethought Society,* the plaintiffs were challenging a plaque of the Ten Commandments affixed to a courthouse. Noting that the plaque was 80 years old, that the county had done nothing to preserve the plaque, that the plaque was only 50 inches by 39 inches (one could not read the plaque's text without climbing the courthouse steps), that the entrance next to the plaque was closed and that many other plaques were also affixed to the same wall, the court concluded that there was no establishment clause violation.

The context of the monument in this case compels the conclusion that advancement of religion was both the purpose and effect of the monument as it existed before the sale. With respect to the purpose of the monument, the facts of this case are virtually indistinguishable from those in *Books,* 235 F.3d at 295, which involved another dispute over a Ten Commandments monument donated by the Eagles to a city, which displayed it on the lawn of its municipal building. In considering whether the monument had a secular purpose, the court noted that several of the Commandments address obedience to God, that the prefatory words "I AM the LORD thy God" were set out in large lettering and that the religious nature of the monument was enhanced by Stars of David and the Greek letters Chi and Ro, which symbolize Jesus Christ when superimposed upon each other. *Id.* at 302. Given the "sacred significance" of the display, the court held that the city had the burden to take steps to "obviate its religious purpose." *Id.* at 303 n. 8 (internal quotations omitted). The city's failure to do so led the court to conclude that the purpose of displaying the monument was not secular. *Id.* at 304; *see also Adland v. Russ,* 307 F.3d 471, 482–83 (6th Cir.2002) (concluding that there was no secular purpose in state's display of Ten Commandments monument on state capitol grounds donated by the Eagles); *O'Bannon,* 259 F.3d at 772 (same); *American Civil Liberties Union of Ohio v. Ashbrook,* 211 F.Supp.2d 873, 886 (N.D.Ohio 2002) ("When a governmental entity specifically decides to display the Ten Commandments ... Courts generally find that action to have a religious rather than secular purpose."); *ACLU Nebraska Foundation v. City of Plattsmouth Nebraska,* 186 F.Supp.2d 1024, 1034–35 (D.Neb.2002) (holding that display of Ten Commandments monument donated by Eagles had primary purpose and effect of advancing or endorsing religion); *Kimbley v. Lawrence County, Indiana,* 119 F.Supp.2d 856 (S.D.Ind.2000) (desire to display religious values of Ten Commandments not a secular purpose).

The design of the monument in this case is the same as the one in *Books;* as in that case, defendant has not presented the text of the Ten Commandments "in a way that might diminish its religious character." *Books,* 235 F.3d at 303. Further, the fact that the monument was paid for with private funds is not relevant when the monument became the property of defendant and was placed on city-owned land. *Stone,* 449 U.S. at 42, 101 S.Ct. 192. Defendant makes a half-hearted attempt to demonstrate a secular purpose by pointing to the fact that the monument was dedicated to those who participated in efforts to protect the city from the 1965 flood, but this argu-

ment is not persuasive. First, it is difficult to see how dedicating a monument to a particular group can diminish its religious nature. A Bible is no less holy because the blank line following the phrase "Presented To" in the front cover is filled in with the name of a non-believer instead of a Christian minister. Building a church in memory of a beloved parishioner does not make it any less a place of worship. Similarly, using the monument to recognize the achievements of the city's youth does not alter the religious message that the monument conveys.

Even if a dedication could be relevant in determining the purpose of a display, the facts show that the dedication of the monument in this case had little to do with the reason for the monument's placement. It is undisputed that the purpose of the monument was to "preserv[e] the moral and religious heritage of the United States." The Eagles did not donate the monument *because* of the youths' efforts. Rather, the donation was part of a nation-wide program that was conceived and implemented long before the 1965 flood. Defendant's acceptance of the monument was also unrelated to the flood. As plaintiffs point out, defendant made its decision to accept the monument before the flood occurred. Accordingly, I conclude that the primary purpose of the monument was religious in nature.

Defendant's failure to satisfy the first part of the *Lemon* test is dispositive of the question whether the monument was in compliance with the establishment clause prior to the sale. *See Books,* 235 F.3d at 292. Even assuming, however, that the monument had a secular purpose, I would nevertheless have to conclude that the monument had the primary effect of advancing religion because a reasonable observer would conclude that defendant endorsed the views embodied in the Ten Commandments. Again, the facts in this

case are nearly identical to those in *Books,* in which the court came to the same conclusion. At the time plaintiffs filed this lawsuit, the monument stood in a city-owned park as a permanent fixture. Although a private group had donated the monument, it was owned by defendant and therefore a reasonable observer would impute the message of the monument to defendant. The monument was not part of a larger display of important historical legal documents but rather it stood alone in the park as the sole message being sent by defendant. *See State v. Freedom From Religion Foundation, Inc.,* 898 P.2d 1013 (Colo.1995) (upholding placement of Ten Commandments monument in state park in part because monument was only one of many displays in park). In the context of this case, it could not be argued that a reasonable observer would view the monument as merely encouraging a general respect for the law, *see Allegheny,* 492 U.S. at 652–53, 109 S.Ct. 3086 (Stevens, J., concurring in part and dissenting in part) (stating that display of Moses holding Ten Commandments was consistent with establishment clause when presented as part of display of "great lawgivers") or as a ceremonial display that has lost its religious meaning "through rote repetition," *Lynch,* 465 U.S. at 717, 104 S.Ct. 1355 (Brennan, J., dissenting).

3. *Constitutionality after the sale*

■ The more difficult question is whether defendant has cured the establishment clause violation by selling the monument back to the Eagles and installing fences and signs that disclaim sponsorship of the monument. The Supreme Court has never considered under what circumstances the sale of property can be a valid way to end the government's endorsement of a religious message on that property. However, in *City of Marshfield,* 203 F.3d at 491, the Court of Appeals for the Sev-

enth Circuit concluded, "Absent unusual circumstances, a sale of real property is an effective way for a public body to end its inappropriate endorsement of religion." The court cautioned, "We are aware, however, that adherence to a formalistic standard invites manipulation. To avoid such manipulation, we look to the substance of the transaction as well as its form to determine whether government action endorsing religion has actually ceased." *Id.* What the court of appeals cautioned against has occurred in this case. Because the facts show that defendant's endorsement of the religious expression on the monument has not ceased, I must conclude that defendant has failed to cure the establishment clause violation.

First I note that defendant's sale of the parcel was an isolated act benefitting one group. Other courts have suggested that, to pass constitutional muster, the sale of public land that aids a particular religious group or message must be part of a general policy or program that is unrelated to religion. *See Southside Fair Housing Committee v. City of New York*, 928 F.2d 1336 (2d Cir.1991) (upholding city's sale of land to religious group because it was part of general urban renewal plan). In this case, there was no reason to sell the land other than to maintain the location of the monument. Although the court of appeals suggested in *City of Marshfield* that the government may cure an establishment clause violation through the sale of property, this is only if the sale evinces the government's intent to end its endorsement.

In arguing that the sale ended its support for the monument's religious message, defendant asserts that it sold the parcel to the Eagles for fair market value and complied with state law by finding that the parcel was no longer needed for park purposes, two factors that the court considered in *City of Marshfield.* Plaintiff disputes both of these assertions, arguing that the evidence shows that there was a shortage of parks in the city and that the parcel was worth more than the amount for which defendant sold it. I need not resolve this dispute because it is not dispositive whether the parcel was actually needed for park purposes or actually sold at fair market value. Although following proper procedure in a sale may support a conclusion that the sale was not made for a sectarian purpose, the Supreme Court, like the court of appeals, has cautioned against being overly "formalistic" in conducting an analysis under the establishment clause. *Lee*, 505 U.S. at 595, 112 S.Ct. 2649; *Santa Fe*, 530 U.S. at 311, 120 S.Ct. 2266. The factors discussed in *City of Marshfield* are not to be checked off like a laundry list so that following them creates an irrebuttable presumption that a public body has acted with a secular purpose. The ultimate question is not whether defendant has complied with the technical requirements of state law but whether it has "promote[d] or affiliate[d] itself with any religious doctrine or organization." *Allegheny*, 492 U.S. at 590, 109 S.Ct. 3086. Thus, a court must look at the entire context of the sale to determine whether the sale demonstrates a preference for religion.

It is undisputed that defendant made little effort to determine either what the fair market value of the parcel was or whether the parcel was needed for park purposes. This suggests that defendant was primarily interested in complying with the minimum legal requirements necessary to keep the monument in the park rather than ending its endorsement or getting rid of unneeded land. Of course, the question whether a 20' × 20' parcel of land is "needed" as a park suggests an obvious answer of "no." But even if the parcel would not be missed, its small size combined with its location in the middle of the park further supports a conclusion that

"unusual circumstances" are present in this case and that defendant has attempted to manipulate the factors identified in *City of Marshfield* to disguise its continued endorsement.

It is important to note that this is not a case in which defendant decided to sell an unoccupied portion of the park because it was no longer needed for park purposes and then the new owner made its own choice to erect a religious monument. *See Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion) (no violation of establishment clause when government, through neutral program, gives financial aid to parents who then use it for religious schools). Rather, defendant sold a very small parcel of land in the middle of a park to a pre-determined buyer for the purpose of preserving *one* religious message in the park. This is a "special and unusual" act similar to the one declared unconstitutional by the Supreme Court in *Board of Education of Kiryas Joel Village School District v. Grumet,* 512 U.S. 687, 702, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994). In that case, the New York legislature passed a special law creating a separate school district for the village of Kiryas Joel, which was an enclave for Hasidic Jews. *Id.* at 690, 114 S.Ct. 2481. The court concluded that the law violated the establishment clause in large part because the legislature had acted with the intent to benefit one particular religious group rather than "all groups similarly interested in separate schooling." *Id.* at 708, 114 S.Ct. 2481.

Similarly, defendant has sold a plot of land to *one* group with *one* religious viewpoint. (The fact that the Ten Commandments are included in both the Jewish and Christian traditions is of no consequence. The Supreme Court has held that government discrimination in favor of religion is unconstitutional even if the discrimination favors multiple religions rather than just one. *Lee,* 505 U.S. at 594, 112 S.Ct. 2649.) Defendant has never allowed any other group to place a permanent monument in the park. Further, defendant did not make the decision to sell because it wanted to foster the speech of all its citizens in the park but because it believed the sale was the only way to insure that the monument would stay where it was. It refused or ignored plaintiff Freedom from Religion Foundation's offer to purchase the land. There is no evidence to suggest that defendant considered selling the parcel to any other group besides the Eagles.

Defendant points out that it placed few restrictions on the sale and that the Eagles can move or alter the monument at any time they wish. To the extent defendant means to suggest that it was *not* concerned with preserving the monument's religious message, this is a disingenuous assertion at best. Defendant has communicated very clearly its intent to keep the monument in Cameron Park. Defendant passed a resolution stating that the monument should be kept in the park by "any and all means available to the City." Defendant was true to its word when it rejected offers from both the Eagles *and* a local Episcopal church to move the monument to private property. There would be little reason to reject these offers unless defendant was intent on furthering the monument's message. Although defendant placed few restrictions on the sale, this was because it did not have to. It was the Eagles that donated the monument to defendant, that maintained the monument over the years and that in 2001 stated that "we believe in the ideas etched in this piece of stone." There is little chance that they will choose to move or alter the monument of their own accord. If defendant was truly motivated only by its desire to end its endorsement, it would not have refused to consider the foundation's offer to purchase the land. By rejecting alterna-

tives to displaying the monument in the park, defendant "invite[d] and encourage[d][a] religious messag[e]" when it sold the parcel of land to defendant. *Santa Fe,* 530 U.S. at 306, 120 S.Ct. 2266.

It is also revealing to consider the history of defendant's position with respect to the monument. None of defendant's efforts to diminish the perception of endorsement for the monument were initiated voluntarily. Rather, defendant has continuously resisted efforts to move or modify the monument until it realized it had no other choice. It rejected plaintiff's request to remove the monument in the 1980s, even after a lawsuit was filed. As indicated by the city attorney's meeting with the Board of Park Commissioners, the only reason defendant took any action with respect to the monument was that plaintiffs were suing defendant again and it was apparent that the city could not prevail under the law of this circuit unless it made some modification. Far from suggesting that defendant has ended its endorsement of the monument's religious message, its attempt to alter its behavior as minimally as possible demonstrates its continuing support of the religious speech. *See id.* at 309, 120 S.Ct. 2266 (concluding that school district acted with sectarian purpose based on past efforts to sponsor prayer at school sporting events).

The principle of government neutrality emphasized in *Grumet* animates much of the Supreme Court's and other courts' jurisprudence under both the establishment and free exercise clauses of the First Amendment. *Santa Fe,* 530 U.S. at 303, 120 S.Ct. 2266 (distinguishing case from those that involved government policy of allowing "indiscriminate use" of forum by both religious and non-religious speakers); *Capitol Square Review and Advisory Board v. Pinette,* 515 U.S. 753, 762, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (concluding that display of cross by Ku Klux

Klan on public property did not violate establishment clause when same access was available to other groups); *Corporation of the Presiding Bishop v. Amos,* 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (aim of establishment clause is to prevent government from "abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters"); *Larson v. Valente,* 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *Summum v. City of Ogden,* 297 F.3d 995 (10th Cir.2002) (city violated First Amendment when it allowed Christians to display symbols in public park but did not allow other churches to do so); *Grossbaum v. Indianapolis–Marion County Building Authority,* 63 F.3d 581, 591–92 (7th Cir.1995) (state may not forbid private religious displays on public property when other types of messages are permitted); *Van Zandt v. Thompson,* 839 F.2d 1215 (7th Cir.1988) (no establishment clause violation when state legislature designated room for "prayer and meditation" because room could be used for religious or non-religious reflection). This principle of neutrality is violated when the government uses its authority to preserve the message of one religious viewpoint to the exclusion of all others. *Cf. Paulson v. City of San Diego,* 294 F.3d 1124, 1132 (9th Cir.2002) (en banc) (holding that city's efforts to preserve religious symbol violated state constitution because they demonstrated preference for one religion over others). Neutrality means more than just changing the name on a deed when all the other actions by the government show that there has been no substantive change in the government's position. Under defendant's view of the law, Chief Justice Moore would be permitted to display the Ten Commandments in his court-

room so long as he could convince the state to sell a tiny portion of the courthouse to a private party and erect a disclaiming sign. Further, defendant could continue to sell parcels of the park to any group of its choosing that it knew would erect religious symbols consistent with the views of the city. These results would not be consistent with the First Amendment's promise of government neutrality in matters relating to religion.

Defendant has done in this case exactly what Justice Souter warned against in *Capitol Square,* 515 U.S. at 792, 115 S.Ct. 2440 (Souter, J. concurring): it has "encourag[ed] the private enterprise of the religious to exhibit what the government could not display itself." Because the facts show that defendant did not have a secular purpose in selling the parcel of land to the Eagles, it has failed to cure the establishment clause violation.

I also conclude that a reasonable observer would continue to believe that defendant endorses the religious expression on the monument. Although the Eagles are the purported owners of the monument now, the Supreme Court has emphasized that the government may not abandon its duty of religious neutrality simply because private rather than public speech is at issue. *See, e.g., Santa Fe,* 530 U.S. at 302–03, 120 S.Ct. 2266; *Capitol Square,* 515 U.S. at 772, 115 S.Ct. 2440 (O'Connor, J., concurring in part and concurring in the judgment); *see also City of Marshfield,* 203 F.3d at 493–97 (reasonable observer could still view religious expression as government sponsored even after statute of Jesus Christ and surrounding land were sold to private party). A "reasonable observer" is one that is "aware of the history and context of the community and forum in which the religious display appears." *Capitol Square,* 515 U.S. at 780, 115 S.Ct. 2440 (O'Connor, J., concurring); *see also Santa Fe,* 530 U.S. at 308, 120 S.Ct. 2266.

In this case, the knowledge that would be imputed to a reasonable observer cuts against defendant. There is certainly a colorable argument that a newcomer to La Crosse would not believe that defendant continued to endorse its religious expression now that there is a sign on the fence around the monument stating expressly that defendant does not endorse the expression. *See Capitol Square,* 515 U.S. at 794, 115 S.Ct. 2440 (Souter, J., concurring) (disclaimer in front of cross explaining that it was erected by private individuals without government support would be sufficient to eliminate perception that government endorsed speech of Ku Klux Klan). However, anyone aware of the "history and context" of defendant's relationship with the monument would know that defendant *wanted* to keep the monument on city property, that it resisted all efforts to remove the monument and that the disclaimer was placed in front of the monument only in response to a threat to have the monument removed all together. The impression of endorsement is further enhanced by the fact that the "private park" in which the monument sits is a mere 20 square feet and is surrounded on three sides by city-owned property. Under these circumstances, it is difficult to accept an argument that a reasonable observer would see the disclaimer as genuine. *See American Jewish Congress,* 827 F.2d at 128 (holding that disclaimer signs did not sufficiently diminish perception of endorsement because message of support was "too pervasive to be mitigated by the presence of disclaimers"). Because defendant's sale of the monument did not extinguish municipal endorsement, plaintiffs' motion for summary judgment must be granted.

■ The only remaining issue is the remedy. In *City of Marshfield,* 203 F.3d at 497, the court of appeals did not order the city to take the religious display down

but rather directed it to take steps that would more fully eradicate any perception of endorsement. However, in *O'Bannon*, 259 F.3d at 773, the court affirmed the district court's decision to prohibit placement of the religious monument on public property. Under the facts of this case, I see no way that defendant's endorsement of the monument's religious message can be eliminated without removing the marker from the park. At this point, selling a larger section of the park or putting up more signs and disclaimers would fail to communicate a genuine message that the endorsement has ended. *See Milliken v. Bradley*, 418 U.S. 717, 744, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (equitable remedy should be determined by the nature and extent of the violation). Therefore, I will grant plaintiff's request for injunctive relief and order that the parcel of land be returned to defendant and that defendant remove the monument from the park.

## C. *Conclusion*

I recognize that a great many people view the Ten Commandments as embodying a universal moral code that should be followed, or at least appreciated and respected, by all. And I have no doubt that many citizens of La Crosse agree with Justice Douglas's statement that "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952). For these people, it may be difficult to understand why anyone would oppose the public display of such a venerated symbol. They may be frustrated by what they view as the judiciary's continuing hostility to religious expression.

In response to these concerns, I make two observations. First, it is respect for religion, not hostility toward it, that is the animating principle behind the establishment clause. *See Engel v. Vitale*, 370 U.S. 421, 433–35, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). The First Amendment guarantees

persons of *all* faiths that the government will treat them with equal concern and respect. Individuals must feel free to choose their own paths in their search for ultimate meaning. By prohibiting the government from favoring those who believe over those who do not, the establishment clause helps protect the rights of Christians, Jews, Buddhists, agnostics, Muslims and atheists. *See Zorach*, 343 U.S. at 325, 72 S.Ct. 679 (Jackson, J., dissenting) ("The day that this country ceases to be free for irreligion it will cease to be free for religion—except for the sect that can win political power.")

Second, when the government displays favoritism to one faith, or even to multiple faiths, it sends a chilling message to those in the minority that they are not full members of the community. *Lynch*, 465 U.S. at 688, 104 S.Ct. 1355 (O'Connor, J., concurring). Although supporters of the monument may view its message as inclusive and nonthreatening, members of minority faiths may disagree. Throughout the depositions of the plaintiffs in this case, the recurring theme was that the monument made them feel that they were not welcome, that they did not belong in La Crosse unless they followed Judeo Christian traditions. One of the most basic teachings of the Constitution is that it "neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (Harlan, J., dissenting). This principle is threatened any time the government throws its support behind the message of one group while disregarding the messages of all others. Although one religious display may appear to some to have an insignificant impact on a citizen's standing in the community, the Supreme Court has observed that "it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment. The breach of neutral-

ity that is today a trickling stream may all too soon become a raging torrent." *Abington v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

## ORDER

IT IS ORDERED that

1. Defendant City of La Crosse's motion for summary judgment is DENIED and plaintiffs' motion for summary judgment is GRANTED.

2. It is DECLARED that the presence of the Ten Commandments monument in Cameron Park violates the establishment clause of the First Amendment. The parcel of the park sold to the Fraternal Order of the Eagles must be returned to defendant and defendant must remove the monument from the park,

3. The case will proceed to trial on the issue of plaintiffs' damages.